**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| GERARDO GONZALEZ; SIMON CHINIVIZYAN, | Nos. 20-55175 20-55252 |
| *Plaintiffs-Appellees/ Cross-Appellants*, | |
| | D.C. Nos. 2:12-cv-09012- AB-FFM 2:13-cv-04416- AB-FFM |
| v. | |
| UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT; DAVID MARIN; DAVID C. PALMATIER; THOMAS WINKOWSKI, | |
| *Defendants-Appellants/ Cross-Appellees.*\* | OPINION |

Appeal from the United States District Court
for the Central District of California
André Birotte, Jr., District Judge, Presiding

Argued and Submitted July 13, 2020
Pasadena, California

---

\* The United States Department of Homeland Security (DHS) identified itself as a party to these cross appeals. Although DHS objected to a subpoena in the district court, it was not, however, a defendant in the underlying case. Although Defendant United States Immigration and Customs Enforcement (ICE) is a component of DHS, DHS did not move to intervene in the district court nor in these cross appeals, and thus it is not technically a party. Accordingly, we amend the case caption to remove DHS as a Defendant-Appellant/Cross-Appellee.

Filed September 11, 2020

Before: MILAN D. SMITH, JR., JOHN B. OWENS, and
BRIDGET S. BADE, Circuit Judges.

Opinion by Judge Milan D. Smith Jr.;
Dissent by Judge Bade

## SUMMARY[**]

### Immigration

In a class action in which the district court issued two permanent injunctions enjoining the issuance of certain immigration detainers in light of Fourth Amendment challenges, the panel: (1) affirmed the district court's certification of a subclass, (2) reversed and vacated one injunction, (3) reversed and vacated the other injunction, and remanded for the district court to reconsider the claim related to that injunction, and (4) reversed and vacated summary judgment for the Government on a claim related to another subclass, and remanded for the district court to reconsider that claim.

Gerardo Gonzalez is a citizen of the United States who has never been removable. After he was arrested on state law criminal charges, however, an Immigration and Customs Enforcement (ICE) agent ran his name through electronic databases and determined that he was removable. The

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

officer issued an immigration detainer, a form by which the Department of Homeland Security (DHS) requests, in relevant part, that a federal, state, or local law enforcement agency (LEA) temporarily detain an alien in that agency's custody "for a period not to exceed 48 hours, excluding Saturdays, Sundays, and holidays in order to permit assumption of custody by [DHS]."  8 C.F.R. § 287.7.

Gonzalez represents three certified classes that include all current and future individuals who are subject to an immigration detainer issued by an ICE agent located in the Central District of California, excluding individuals with final orders of removal or who are subject to ongoing removal proceedings.  The Probable Cause Subclass is further limited to persons where the detainer was issued solely on the basis of electronic database checks.  The district court entered two injunctions with respect to the Probable Cause Subclass: the State Authority Injunction and the Database Injunction.  The district court also granted summary judgment to the Government on a claim brought by the Judicial Determination Class.  A motions panel of this court stayed the State Authority Injunction and denied the request to stay the Database Injunction.

First, the panel held that Gonzalez had Article III standing to seek prospective injunctive relief, concluding that he faced an ongoing and prospective detention injury when he commenced suit.  The panel also concluded that the Government's cancellation of the detainer within hours of Gonzalez bringing suit did not moot his claims, citing the "inherently transitory" exception to mootness.

Second, the panel affirmed the certification of the Probable Cause Subclass with Gonzalez as the class representative.  The panel concluded that the subclass

satisfied the commonality requirement, explaining that the challenged policy of issuing detainers solely on the basis of electronic database checks is the "glue" that holds the class together. The panel also concluded that the subclass satisfied the typicality requirement. The panel rejected the Government's contention that Gonzalez, as a U.S. citizen, is atypical of noncitizen class members over whose claims the district court lacked subject matter jurisdiction under 8 U.S.C. § 1252(b)(9), which limits review of claims arising from removal proceedings. Assuming the relevance of jurisdiction over the unnamed noncitizen class members, the panel concluded that § 1252(b)(9) does not bar jurisdiction over the claims here because the claims challenge the legality of detention and are independent of the removal process. The panel also concluded that a determination about the lawfulness of the challenged policy under the Fourth Amendment and corresponding relief would provide relief to the entire class.

Third, the panel held that injunctive relief in this case is not barred by 8 U.S.C. § 1252(f)(1), which provides that "no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter, as amended . . . ." The panel explained that § 1252(f)(1) does not bar injunctive relief for the claims in this case because the only provision of the Immigration and Nationality Act (INA) whose text even refers to immigration detainers, 8 U.S.C. § 1357(d), is not located in "Part IV" and therefore is not among the provisions that § 1252(f)(1) encompasses. The panel also rejected the Government's argument that its detainer authority is implied by provisions covered by § 1252(f)(1), explaining that it must assume that Congress acted intentionally, and that the detainers here do not directly

implicate the authority of the provisions cited by the Government.

Fourth, the panel reversed and vacated the State Authority Injunction, which enjoins the Government from issuing detainers from the Central District to LEAs in states that lack state law permitting state and local LEAs to make civil immigration arrests based on civil immigration detainers. The panel explained that the presence or absence of probable cause determines whether the Government violates the Fourth Amendment when issuing a detainer, not state law restrictions. In so holding, the panel underscored that it did not decide here whether immigration detainers might violate principles of federalism or preemption, noting that Plaintiffs had waived such claims.

Fifth, the panel reversed and vacated the Database Injunction, which enjoins the Government from issuing detainers to class members based solely on searches of electronic databases to make probable cause determinations of removability. The panel concluded that three errors required reversal: (1) the district court's incomplete set of reliability findings concerning the databases at issue; (2) the district court's legal error in concluding that the databases are unreliable because no database was intended to show probable cause of removability; and (3) the district court's failure to address whether there was systemic error in ICE's probable cause determinations based on searches of the databases. The panel remanded for the district court to reconsider the claim.

Finally, the panel reversed the summary judgment for the Government on Plaintiffs' claim pursuant to *Gerstein v. Pugh*, 420 U.S. 103 (1975), in which the Supreme Court explained that the Fourth Amendment requires that probable

cause be timely decided by a neutral and detached magistrate whenever possible. The *Gerstein* claim was brought by the Judicial Determination Class, which was defined, in relevant part, to include those individuals detained pursuant to a detainer for longer than 48 hours. Explaining that the district court erred in concluding that *Gerstein* does not apply in the civil immigration context, the panel concluded that, because the Fourth Amendment requires probable cause to seize or detain an individual for a civil immigration offense, it follows that the Fourth Amendment requires a prompt probable cause determination by a neutral and detached magistrate to justify continued detention pursuant to an immigration detainer. Therefore, the court remanded for the district court to apply the correct legal standard.

Dissenting, Judge Bade wrote that Congress enacted a clear jurisdictional bar to injunctive relief in § 1252(f)(1) and that the majority erred in holding that § 1252(f)(1) does not bar injunctive relief in this case. Judge Bade found the majority's approach flawed for two reasons: the majority (1) ignored the plain language of the statute, and (2) erroneously concluded that § 1357(d) is the sole source of ICE's authority to issue detainers. Judge Bade wrote that the majority's approach opens the door to sweeping challenges to basic tools of immigration enforcement.

## COUNSEL

Erez Reuveni (argued), Assistant Director; Francesca Genova and Archith Ramkumar, Trial Attorneys; Lauren C. Bingham, Senior Litigation Counsel; William C. Peachey, Director, District Court Section; Scott G. Stewart, Deputy Assistant Attorney General; Joseph H. Hunt, Assistant Attorney General; Office of Immigration Litigation, Civil

Division, United States Department of Justice, Washington, D.C.; for Objector-Appellant.

Jennifer Pasquarella (argued), Jessica Karp Bansal (argued), and Zoe McKinney, ACLU Foundation of Southern California, Los Angeles, California; Barrett S. Litt and Lindsay B. Battles, Kaye McLane Bednarski & Litt, Pasadena, California; Spencer E. Amdur and Cody Wofsy, ACLU Foundation Immigrants' Rights Project, San Francisco, California; Omar C. Jadwat, ACLU Foundation Immigrants' Rights Project, New York, New York; Mark M. Fleming and Ruben Loyo, National Immigrant Justice Center, Chicago, Illinois; for Plaintiffs-Appellees/Cross-Appellants.

Christopher J. Hajec, Immigration Reform Law Institute, Washington, D.C., for Amicus Curiae Immigration Reform Law Institute.

Saira Hussain and Jennifer Lynch, Electronic Frontier Foundation, San Francisco, California, for Amicus Curiae Electronic Frontier Foundation.

Brook Dooley and Andrew S. Bruns, Keker Van Nest Peters LLP, San Francisco, California; Ilya Shapiro, Cato Institute, Washington, D.C.; for Amicus Curiae Cato Institute.

Susan M. Krumplitsch, DLA Piper LLP (US), East Palo Alto, California; Alexis Burgess, DLA Piper LLP (US), Los Angeles, California; for Amici Curiae National Immigration Project of the National Lawyers Guild; Immigrant Legal Resource Center; University Of Nevada, Las Vegas Immigration Clinic; National Association of Criminal Defense Lawyers; Washington Defender Association;

Brooklyn Defender Services; Bronx Defenders; and Immigrant Defense Project.

Anne Lai, University of California, Irvine School of Law, Irvine, California, for Amici Curiae Law and History Professors.

Michael Shipley, Jonathan Faria, and Eric Sefton, Kirkland Ellis LLP, Los Angeles, California; Katherine Evans, Christine Mullen, Zachary Pollack, and Amanda Ng, Duke Immigrant Rights Clinic, Duke University School of Law; for Amici Curiae Organizations That Represent Individuals Subject to Civil Arrest.

## OPINION

M. SMITH, Circuit Judge:

Gerardo Gonzalez is a United States citizen. He has never been removable from the United States. The United States Immigration and Customs Enforcement (ICE), however, came to a different conclusion in December 2012. After Gonzalez was booked on state law criminal charges by the Los Angeles Police Department (LAPD), an ICE agent ran his name through electronic databases, an automated procedure that ICE uses to determine whether an individual is a removable noncitizen. Because one database flagged Gonzalez's birthplace as being in Mexico, and the agent could not find records showing that Gonzalez had lawfully entered the United States, the agent determined that Gonzalez was removable from the United States. ICE issued an immigration detainer, requesting that the Los Angeles Sheriff's Department (LASD) detain Gonzalez for up to an additional five days in the Los Angeles County Jail after

when he was entitled to release from custody on state criminal charges so that ICE could take him into its custody. While the detainer remained pending, Gonzalez brought this suit against the Government[1], raising Fourth Amendment, Fifth Amendment, and statutory claims to challenge the legality of the detainer.

Gonzalez represents three certified classes which are defined to include, in relevant part, all current and future individuals who are subject to an immigration detainer issued by an ICE agent located in the Central District of California, excluding individuals with final orders of removal or who are subject to ongoing removal proceedings. The district court entered a judgment and two permanent injunctions in favor of Gonzalez and the Probable Cause Subclass on Fourth Amendment claims following a seven-day bench trial. The State Authority Injunction enjoins the Government from issuing detainers from the Central District to law enforcement agencies (LEAs) in states that lack state law permitting state and local LEAs to make civil immigration arrests based on civil immigration detainers. The Database Injunction enjoins the Government from issuing detainers to class members based solely on searches of electronic databases to make probable cause determinations of removability. The Government appeals the injunctions, and Plaintiffs cross appeal a summary judgment ruling in the Government's favor.

We resolve several issues in this opinion. *First*, we hold that Gonzalez had Article III standing to seek prospective injunctive relief when he commenced suit. The

---

[1] We refer to the Defendants as "the Government." An uncapitalized reference to the "government" should not be construed as a specific reference to the Defendants.

Government's cancellation of the detainer against him does not alter that conclusion. *Second*, we hold that the district court did not abuse its discretion in certifying the Probable Cause Subclass pursuant to Rule 23(b)(2) with Gonzalez as the class representative. *Third*, we hold that 8 U.S.C. § 1252(f)(1) does not bar injunctive relief for the claims in this case because the only provision of the Immigration and Nationality Act (INA) whose text even refers to immigration detainers is not among the provisions that § 1252(f)(1) encompasses. *Fourth*, we reverse and vacate the State Authority Injunction because the presence or absence of probable cause determines whether the Government violates the Fourth Amendment when issuing a detainer, not state law restrictions. In so holding, we underscore that we do not decide here whether immigration detainers might violate principles of federalism or preemption. *Fifth*, we reverse and vacate the Database Injunction because it is premised on legal error and lacks critical factual findings. Notably, the district court failed to assess error in the system of databases on which ICE relies to make probable cause determinations of removability. *Finally*, we reverse the summary judgment for the Government on Plaintiffs' claim pursuant to *Gerstein v. Pugh*, 420 U.S. 103 (1975) (the *Gerstein* claim). Because the Fourth Amendment requires probable cause to seize or detain an individual for a civil immigration offense, it follows that the Fourth Amendment requires a prompt probable cause determination by a neutral and detached magistrate to justify continued detention pursuant to an immigration detainer. Thus, we affirm in part, reverse in part, and remand.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. The Use of Immigration Detainers

References to immigration detainers and immigration holds on persons in state or federal criminal custody can be found as early as the 1940s. *See Chung Young Chew v. Boyd*, 309 F.2d 857, 865 (9th Cir. 1962); *Slavik v. Miller*, 89 F. Supp. 575, 576 (W.D. Pa. 1950), *aff'd*, 184 F.2d 575 (3d Cir. 1950); *Ex parte Korner*, 123 P.2d 111, 112 (Cal. Ct. App. 1942).

Congress, however, first codified the authority to issue immigration detainers in 1986 as a provision of the INA. *See* Anti-Drug Abuse Act of 1986, Pub. L. No. 99-570, 100 Stat. 3207–48, § 1751(d) (1986) (codified at 8 U.S.C. § 1357(d)). Section 1357(d) authorizes the issuance of detainers to federal, state, or local LEAs for individuals suspected of being aliens and who are arrested for violating any law relating to a controlled substance offense.[2] The provision

---

[2] Section 1357(d), titled "detainer of aliens for violation of controlled substances laws," provides in full that:

> In the case of an alien who is arrested by a Federal, State, or local law enforcement official for a violation of any law relating to controlled substances, if the official (or another official)—

> (1) has reason to believe that the alien may not have been lawfully admitted to the United States or otherwise is not lawfully present in the United States,

> (2) expeditiously informs an appropriate officer or employee of the Service authorized and

does not require that such an LEA actually detain an individual.

Although § 1357 is the only statutory provision that refers to immigration detainers and concerns only suspected aliens who are arrested for a controlled substance offense, the Department of Homeland Security (DHS) and ICE, one of its component agencies, use immigration detainers to enforce federal immigration law more generally. *See* 8 C.F.R. § 287.7 (titled "detainer provisions under section 287(d)(3) of the Act"). Pursuant to § 287.7, a detainer is a form by which DHS requests, in relevant part, that a federal, state, or local LEA temporarily detain an alien in that agency's custody "for a period not to exceed 48 hours, excluding Saturdays, Sundays, and holidays in order to permit assumption of custody by [DHS]." *Id.* § 287.7(d).

---

designated by the Attorney General of the arrest and of facts concerning the status of the alien, and

(3) requests the Service to determine promptly whether or not to issue a detainer to detain the alien,

the officer or employee of the Service shall promptly determine whether or not to issue such a detainer. If such a detainer is issued and the alien is not otherwise detained by Federal, State, or local officials, the Attorney General shall effectively and expeditiously take custody of the alien.

8 U.S.C. § 1357(d).

Form I-247A is the current immigration detainer form.[3]  *Id.*
§ 287.7(a).  A detainer is not a warrant of any kind.

In 2008, DHS launched the Secure Communities
program, which automated the issuance of immigration
detainers.  The program links DHS databases with the FBI's
nationwide fingerprint database, which receives fingerprints
from state and local LEAs after bookings.  All persons
arrested in the United States by a LEA have their fingerprints
and associated personal information automatically checked
against DHS databases for immigration purposes.  The
issuance of detainers increased exponentially following
automation.  Whereas ICE issued roughly 600 detainers per
month in FY 2005, monthly detainers exceeded 26,000 by
the end of FY 2011.

Until December 2012, ICE issued detainers based only
on the initiation of an investigation into whether an
individual was removable.  In 2017, ICE changed its detainer
policy in response to litigation.[4]  Under its current policy,
ICE issues a detainer in the case of an individual arrested for
a criminal offense when "the officer has probable cause to
believe that the subject is an alien who is removable from the
United States."  Under the policy, a signed administrative
arrest warrant issued pursuant to 8 U.S.C. §§ 1226 or
1231(a)—INA provisions concerning the Attorney

---

[3]A publicly available version of Form I-247A is available here: U.S.
DEP'T OF HOMELAND SEC., *U.S. Immigration & Customs Enf't*, Form I-247A, https://www.ice.gov/sites/default/files/documents/Document/2017/I-247A.pdf (last visited September 2, 2020).

[4] *See U.S. Immigration & Customs Enf't*, Policy No. 10074.2:
*Issuance of Immigration Detainers by ICE Immigration Officers*, available at: https://www.ice.gov/sites/default/files/documents/Document/2017/10074-2.pdf (last visited September 2, 2020).

General's authority to perform arrests by warrant and detain certain aliens—must now accompany a detainer. This policy is not reflected in the detainer regulation. *See* 8 C.F.R. § 287.7.

Although in issuing an immigration detainer, ICE premises a probable cause determination of removability on any one of four grounds, this case concerns one procedure in particular: ICE's use of biometric information to confirm an individual's identity and a search of electronic databases to determine whether the individual lacks lawful immigration status or has such status but is removable.

## II. The Issuance of Immigration Detainers from the Central District

The immigration detainers at issue in this case are primarily lodged by ICE agents at the Pacific Enforcement Response Center (PERC), located in Laguna Niguel, California. PERC issues detainers 24 hours a day for persons in federal, state, or local LEA custody in the Central District, and issues detainers after hours for individuals in such custody in some forty-two states and two U.S. territories. To issue these detainers, law enforcement specialists at the Law Enforcement Support Center (LESC) and analysts at PERC search multiple electronic databases to find "affirmative evidence of removability." PERC agents do not investigate beyond database checks.

This process commences when a law enforcement officer arrests an individual. The individual's fingerprints are automatically sent to the FBI and run against two databases, the Integrated Automatic Fingerprint Identification System (IAFS) and the Automated Biometric Identification System (IDENT). IDENT assigns a Fingerprint Identification Number (FIN) to each individual's

fingerprints.  IDENT contains fingerprint data for certain U.S. citizens, including those who the FBI believes belong in the system, those who voluntarily enroll in certain trusted traveler programs, those who have applied to naturalize as U.S. citizens, and those who have filed applications for certificates of citizenship.  IDENT contains over 237 million unique identities.  IDENT captures all biometric and biographical information on an individual regardless of typographical errors.  IDENT is a very accurate source of biometric matching.

If there is a fingerprint match in IDENT, an Immigrant Alien Query (IAQ) is automatically generated and sent to LESC.  The Alien Criminal Response Information Management System (ACRIMe) automatically generates an Immigrant Alien Response (IAR), which PERC receives.  To generate the IAR, ACRIMe automatically searches the NCIC (National Crime Information Center), NLETS (National Law Enforcement Telecommunications System), CIS (Central Index System), CLAIMS 3, CLAIMS 4, EID, IDENT, ADIS (Arrival and Departure System), SEVIS (Student and Exchange Visitor Information System), and EOIR (Executive Office for Immigration Review) databases to match the FIN to any other encounter with that individual. The IAR contains basic biographical information and criminal history as well as a short statement about immigration status and removability.  An analyst, who is a federal contractor, conducts a first level review of the IAR and makes a recommendation to an ICE officer about whether a detainer should issue.[5]

---

[5] Although the analyst has the discretion to run an independent database check, which is done in "complex cases," we are unaware of

This system has resulted in the issuance of thousands of detainers. For example, the Government estimates that it issued nearly 50,000 detainers from PERC in FY 2019. Trial evidence nevertheless indicated that ICE does not take into custody up to 80% of the individuals for whom PERC issues immigration detainers.

## III.  The District Court Proceedings

Gonzalez commenced this suit as a putative class action on June 19, 2013 to challenge the outstanding immigration detainer against him, which prevented him from posting bail from custody on state criminal charges, and which threatened an additional period of detention by LASD upon his release from that custody. Within hours after he commenced suit, the Government cancelled the detainer. Simon Chinivizyan, a native of Uzbekistan and a U.S. citizen, became a plaintiff upon the filing of the First Amended Complaint. When he filed suit, he was detained in the Los Angeles County Jail solely pursuant to the detainer.

The case proceeded on the Third Amended Complaint (TAC), filed in August 2014.[6] In relevant part, Plaintiffs raised individual and class claims that the Government violates the Fourth Amendment (1) because a detainer is an unlawful seizure without probable cause or lawful authority,

---

any record evidence concerning the extent to which PERC has "complex cases" for which its analysts perform independent database checks.

[6] In 2015, the district court consolidated this case with *Roy v. County of Los Angeles*, No. 12-cv-09012-BRO-FFM, Dkt. No. 91 (C.D. Cal. July 28, 2015). For this reason, several citations herein bear the *Roy* case caption. After the parties cross appealed, the district court de-consolidated the cases. *Id.* Dkt. No. 590 (C.D. Cal. Mar. 18, 2020).

and (2) the Government fails to provide a prompt probable cause determination by a neutral and detached magistrate (the *Gerstein* claim).  Plaintiffs sought declaratory and injunctive relief.

The district court certified two classes pursuant to Rule 23(b)(2) that are relevant here, the Judicial Determination Class and Probable Cause Subclass.  *Roy v. County of Los Angeles*, Nos. CV 12-09012-BRO(FFMx), CV 13-04416-BRO(FFMx), 2016 WL 5219468 (C.D. Cal. Sept. 9, 2016).  The court certified the Judicial Determination Class with both Plaintiffs as representatives.[7]  *Id.* at \*6, 21.  The claims of this class concern the *Gerstein* claim.  The court also certified the Probable Cause Subclass with Gonzalez as the representative.  *Id.* at \*6, 21.  We discuss herein the amended class definition as well as the class claims decided at trial.

Plaintiffs later moved for summary judgment on the Judicial Determination Class's *Gerstein* claim.  The district court *sua sponte* granted summary judgment for the Government.  *Roy v. County of Los Angeles*, Nos. CV 12-09012-BRO(FFMx), CV 13-04416-BRO(FFMx), 2017 WL 2559616 (C.D. Cal. June 12, 2017).  The court determined that *Gerstein*, including as elaborated in *County of Riverside v. McLaughlin*, 500 U.S. 44 (1991), did not "directly" apply to the immigration context because those cases arose in the criminal context.  *Id.* at \*5.  Focusing on the civil immigration nature of this case, the court determined that it is not unconstitutional for Congress to delegate probable

---

[7] The class consists of "[a]ll current and future persons who are subject to an immigration detainer issued by an ICE agent located in the Central District [ ], where the detainer is not based upon a final order of removal signed by an immigration judge or the individual is not subject to ongoing removal proceedings" and "who were detained for more than forty-eight hours."  *Roy*, 2016 WL 5219468, at \*6, 14.

cause determinations to executive officers, rather than an immigration judge, magistrate judge, or federal judge. *Id.* at *5–10. Thus, the claims of the Judicial Determination Class did not proceed beyond summary judgment.

Shortly before the May 2019 bench trial, the district court amended the Probable Cause Subclass definition as follows:

> all current and future persons who are subject to an immigration detainer issued by an ICE agent located in the Central District [ ], where the detainer is not based upon a final order of removal signed by an immigration judge or the individual is not subject to ongoing removal proceedings and the detainer was issued solely on the basis of electronic database checks.

The court identified the class claims for trial as whether (1) the Government violates the Fourth Amendment by issuing immigration detainers to state and local LEAs in states that do not authorize such LEAs to enforce civil immigration law (the State Authority Claim) and (2) whether the databases that ICE uses to issue immigration detainers from the Central District are unreliable sources of information for probable cause determinations (the Database Claim).

Following trial, the court issued findings of fact and conclusions of law. *Gonzalez v. Immigration & Customs Enf't*, 416 F. Supp. 3d 995 (C.D. Cal. 2019). On the State Authority Claim, the court concluded that ICE "violates the Fourth Amendment by issuing detainers to state and local law enforcement agencies in states that do not expressly authorize civil immigration arrests in state statute[.]" *Id.*

at 1016. On the Database Claim, the court concluded that ICE violates the Fourth Amendment because it relies on "inaccurate, incomplete, and error-filled databases" to make probable cause determinations of removability for immigration detainers. *Id*. at 1016–20. The court determined that permanent classwide injunctive relief on both claims was appropriate. *Id.* at 1020. A formal judgment followed.

The Government timely appealed, sought an emergency stay of the injunctions, and requested that we expedite its appeal. A motions panel of our court stayed the State Authority Injunction, denied the request to stay the Database Injunction, and expedited the appeal. Plaintiffs timely cross appealed.

## JURISDICTION AND STANDARDS OF REVIEW

We have jurisdiction over the final judgment pursuant to 28 U.S.C. § 1291. We also have jurisdiction over previously nonfinal orders that have merged with the judgment, including the summary judgment and class certification orders. *Hall v. City of Los Angeles*, 697 F.3d 1059, 1070–71 (9th Cir. 2012).

"We review for abuse of discretion the district court's class certification rulings[.]" *Senne v. Kan. City Royals Baseball Corp*., 934 F.3d 918, 926 (9th Cir. 2019). "A district court abuses its discretion where it commits an error of law, relies on an improper factor, omits a substantial factor, or engages in a clear error of judgment in weighing the correct mix of factors." *Id.* (citation omitted). We review the district court's standing determinations and summary judgment rulings de novo. *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1196–97 (9th Cir. 2004). We review the district court's factual findings following a bench

trial for clear error and its legal conclusions de novo.  *Fed. Trade Comm'n v. Garvey*, 383 F.3d 891, 900 (9th Cir. 2004). Mixed questions of law and fact are reviewed de novo.  *Shea Homes, Inc. & Subsidiaries v. Comm'r of Internal Revenue*, 834 F.3d 1061, 1066 (9th Cir. 2016).

"We review a district court's decision to grant a permanent injunction for an abuse of discretion; the factual findings underpinning the award for clear error; and the rulings of law relied upon by the district court in awarding injunctive relief de novo."  *In re Nat'l Collegiate Athletic Ass'n Athletic Grant-In-Aid Cap Antitrust Litig.*, 958 F.3d 1239, 1253 (9th Cir. 2020) (citation, internal quotation marks, and alteration omitted).

## ANALYSIS

## I. Gonzalez's Standing for Prospective Injunctive Relief

The Government first argues that Gonzalez lacked standing to seek prospective injunctive relief, and thus could not represent the Probable Cause Subclass on whose behalf the district court issued the State Authority and Database Injunctions.[8]  This is a "threshold issue" concerning an "essential and unchanging part of the case-or-controversy requirement of Article III."  *Horne v. Flores*, 557 U.S. 433, 445 (2009) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).  The Government additionally argues that Gonzalez could not represent a class of individuals raising Fourth Amendment claims concerning detention pursuant to a detainer because a detainer is merely a request, and ICE

---

[8] Chinivizyan is not a member of the Probable Cause Subclass. Thus, his standing is irrelevant to either injunction at issue on appeal.

cancelled the detainer that it lodged against him within hours after he brought suit.  This argument is plainly a disguised challenge to whether Gonzalez continued to have a personal stake in the outcome of this case.  We reject both arguments.

## A.  Article III Standing

"[A]s in all standing inquiries, the critical question is whether [the plaintiff] has 'alleged such a personal stake in the outcome of the controversy as to warrant *his* invocation of federal-court jurisdiction.'"  *Horne*, 557 U.S. at 445 (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)) (emphasis in original).   The plaintiff must demonstrate that: (1) he has suffered an "injury in fact" that is concrete, particularized, and actual or imminent, (2) the injury is "fairly traceable" to the defendant's conduct, and (3) the injury can be "redressed by a favorable decision." *Lujan*, 504 U.S. at 560–61 (alterations in original omitted). As is relevant here, "a plaintiff must demonstrate standing separately for each form of relief sought."  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000).   And "[w]hile the proof required to establish standing increases as the suit proceeds . . . the standing inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome *when the suit was filed*."  *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) (international citations omitted) (emphasis added).  "Our threshold inquiry into standing 'in no way depends on the merits of the [plaintiff's] contention that particular conduct is illegal.'"  *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990) (quoting *Warth v. Seldin*, 422 U.S. 490, 500 (1975)).

The parties' arguments concern Gonzalez's standing to seek prospective injunctive relief based on the pleadings, and thus that is our focus.  *See United States v. Sineneng-*

*Smith*, 140 S. Ct. 1575, 1579 (2020). "[W]hen a plaintiff files a complaint in federal court and then voluntarily amends the complaint, courts look to the amended complaint to determine jurisdiction." *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 473–74 (2007). Although we "look to the amended complaint to determine jurisdiction," *id.* at 474, "subject-matter jurisdiction depends on the state of things at the time of the action brought," *i.e.*, at the time the plaintiff commenced suit, *id.* at 473 (citation and internal quotation marks omitted). Thus, we assess Gonzalez's standing for prospective injunctive relief as of the time when he commenced suit, relying on the allegations in the operative amended complaint. *S. Utah Wilderness Alliance v. Palma*, 707 F.3d 1143, 1153 (10th Cir. 2013). Because "[a] class of plaintiffs does not have standing to sue if the named plaintiff does not have standing," *B.C. v. Plumas Unified Sch. Dist.*, 192 F.3d 1260, 1264 (9th Cir. 1999), Gonzalez's standing determines whether he could seek injunctive relief on behalf of any class in this case.

We conclude that the TAC shows that Gonzalez had standing to seek prospective injunctive relief when he commenced suit, and thus he could represent the class on whose behalf the district court entered the injunctions at issue here.

### 1. Injury

We turn first to gravamen of the parties' dispute: whether Gonzalez suffered an injury sufficient to confer standing. Although a past injury does not provide standing to seek prospective injunctive relief "[a]bsent a sufficient likelihood that [the plaintiff] will again be wronged in a similar way," *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983), the Government errs in arguing that Gonzalez faced a past injury when he brought suit.

The operative TAC recounts that Gonzalez came into LASD custody on December 27, 2012.  On December 31, 2012, ICE issued the immigration detainer against him.  Although the detainer had no effect on Gonzalez's custody when lodged due to a then-applicable parole hold, Gonzalez became eligible for release on bail from LASD custody on state criminal charges in May 2013 when the hold expired.  He attempted to post bail with the assistance of his girlfriend, who went to a bondsman.  The bondsman informed her that Gonzalez was subject to an immigration detainer.  The detainer requested that LASD keep him in custody for up to five additional days after his release from custody on state criminal charges.  The detainer, however, prevented him from posting bail.  Even if he posted the $95,000 bail as he had intended to do, Gonzalez would remain in custody.  Indeed, it was LASD policy to comply with all ICE detainers.  Gonzalez did not post bail, but instead brought this suit.

We have explained that "[r]emaining confined in jail when one should otherwise be free is an Article III injury plain and simple[.]" *Mendia v. Garcia*, 768 F.3d 1009, 1012 (9th Cir. 2014).  Gonzalez's allegations demonstrate that Gonzalez faced an ongoing and a prospective detention injury when he commenced suit.  He faced the ongoing injury of continued detention in LASD custody on the state criminal charges by virtue of the detainer that prevented him from posting bail although he was eligible to do so.  He also faced the imminent injury of an additional period of detention in LASD custody solely by virtue of the detainer.  Because LASD complied with all ICE detainers, the detainer posed a "real, immediate, and direct" threat of future harm of unlawful detention by LASD solely by virtue of the detainer upon his release from custody on state criminal charges.  *Davis*, 554 U.S. at 734 (citing *Lyons*, 461 U.S.

at 102); *Mendia*, 768 F.3d at 1012.  We reject the Government's arguments that neither of Gonzalez's injuries was sufficient.

With respect to the ongoing injury, the Government argues that Gonzalez's injury was "self-inflicted" because he chose to remain in state custody by not posting the $95,000 bail.  The Government's argument correctly observes that we have rejected a plaintiff's choice to remain in state custody following release on recognizance as a "self-inflicted injury."  *Id.* at 1013 n.1.  But the Government ignores our caveat that a plaintiff's decision to remain in state custody does not defeat standing if it was "reasonably incurred to mitigate or avoid the future harm [the plaintiff] claimed to fear."  *Id.* (citation and internal quotation marks omitted).  Gonzalez delayed posting bail to avoid the harm of additional detention.  That harm was not speculative because, as ICE was aware, LASD complied with all immigration detainers when Gonzalez commenced suit.

Seeking to cast doubt on whether Gonzalez would have been detained pursuant to the detainer, the Government also argues that a detainer merely requests detention and is not a command that an LEA detain an individual.**[9]** *See Galarza v.*

---

**[9]** The Government frames this as a merits argument that Gonzalez never suffered a Fourth Amendment seizure pursuant to the immigration detainer and thus, he cannot represent a class of individuals who were detained pursuant to a detainer.  The Government relies on our decision in *Lierboe v. State Farm Mut. Auto. Ins. Co.*, 350 F.3d 1018 (9th Cir. 2003).  But that decision concerned Article III standing.  *Id.* at 1022 ("[O]ur law makes clear that 'if none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the class.'" (quoting *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974))); *see also NEI Contracting & Eng'g, Inc. v. Hanson Aggregates*

*Szalczyk*, 745 F.3d 634, 640–46 (3d Cir. 2014). Even if an immigration detainer is a request, a detainer "results in the detention—or further detention—of an individual" when acted upon. *Hernandez v. United States*, 939 F.3d 191, 200 (2d Cir. 2019). The detainer against Gonzalez requested up to five additional days of detention. Gonzalez alleged that LASD had a policy of complying with all detainers. Thus, he did not need to wait for that detention to challenge its legality. *See Davis*, 554 U.S. at 734 ("[T]he injury required for standing to sue need not be actualized. A party facing prospective injury has standing to sue where the threatened injury is real, immediate, and direct."); *Cent. Delta Water Agency v. United States*, 306 F.3d 938, 948 (9th Cir. 2002).

Finally, the Government focuses on Gonzalez's allegations that "he could be taken into ICE's physical custody and detained for 2 more days, and perhaps longer," to argue that Gonzalez faced a speculative injury that could not support standing for prospective injunctive relief. But, like the district court did[10], the Government conflates two

*Pac. Sw., Inc.*, 926 F.3d 528, 532 (9th Cir. 2019) (confirming that *Lierboe* concerned Article III standing). There, the plaintiff sued on the theory that she had a stacking claim pursuant to Montana law. *Lierboe*, 350 F.3d at 1020. Because state law may create a right whose violation may support constitutional standing, *see In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 600 (9th Cir. 2020), our inquiry necessarily focused on whether the plaintiff actually had any such right under state law, *see Lierboe*, 350 F.3d at 1022–23. Here, however, we need look no further than Gonzalez's ongoing and prospective detention injuries when he commenced suit to conclude that he had standing. The merits of any Fourth Amendment claim concerning that detention do not alter our standing analysis.

[10] We briefly dispose of the Government's assertion that the district court violated the law of the case doctrine by granting injunctive relief following trial while failing to reconsider its earlier determination that

distinct prospective detention injuries: (1) the injury of an additional period of unlawful detention while in LASD custody solely by virtue of the detainer and (2) the injury of unlawful detention *after* being taken into ICE custody, at which point the entire purpose of the detainer would have already been served.   Although both injuries were prospective, the TAC shows only the latter to be too speculative to support Article III standing.

### 2.  Causal Connection

The fact that "ICE never had custody of" Gonzalez does not defeat causation. *Mendia*, 768 F.3d at 1012. The alleged link between the detainer that ICE lodged, and Gonzalez's detention was entirely plausible. *Nat'l Audubon Soc'y, Inc. v. Davis*, 307 F.3d 835, 849 (9th Cir. 2002).  Absent the detainer that ICE had lodged against him, Gonzalez would have posted bail and been released from LASD custody.  He would have faced no additional period of detention by LASD based solely on ICE's belief that he was removable from the

---

Plaintiffs lacked standing to seek prospective injunctive relief.  "[T]he doctrine of 'law of the case' does not apply to the fundamental question of subject matter jurisdiction." *Green v. Dep't of Commerce*, 618 F.2d 836, 839 n.9 (D.C. Cir. 1980).  Thus, the district court was not bound by the earlier standing analysis that it implicitly reconsidered in granting relief.  We also reject the Government's assertion that Plaintiffs forfeited any claim for prospective injunctive relief because they declined to amend the TAC following the district court's determination that they lacked standing to seek such relief.  Although "the ordinary rules of forfeiture apply to standing," a party must fail to raise an argument in the district court to forfeit it. *Gov't of Manitoba v. Bernhardt*, 923 F.3d 173, 179 (D.C. Cir. 2019).  Here, however, Plaintiffs did not fail to request prospective injunctive relief.  And their subsequent decision not to further amend the pleadings on the issue of prospective injunctive relief stemmed from the district court's flawed standing analysis on the issue of their standing to seek such relief.

United States.  But because of the detainer, Gonzalez "remain[ed] in pre-trial detention unnecessarily." *Mendia*, 768 F.3d at 1013.  Thus, Gonzalez satisfies the causation element of standing.

### 3.  Redressability

Because Gonzalez faced ongoing and prospective detention injuries by virtue of the detainer when he commenced suit, his "injury was at that moment capable of being redressed through injunctive relief." *McLaughlin*, 500 U.S. at 51 (rejecting the county's "crabbed reading of the complaint" as concerning a "completed" injury and distinguishing *Lyons* "in which the constitutionally objectionable practice ceased altogether before the plaintiff filed his complaint"); *Cent. Delta Water Agency*, 306 F.3d at 947 ("[T]he possibility of future injury may be sufficient to confer standing on plaintiffs; threatened injury constitutes injury in fact . . . ." (citation and internal quotation marks omitted)).  A court order requiring ICE to rescind its existing immigration detainer would have permitted Gonzalez to post bail from custody on the state criminal charges, thus addressing the ongoing injury he faced when he commenced suit.  But it would also have redressed the imminent harm of additional detention that Gonzalez then faced based solely on the detainer.  In short, Gonzalez had standing to seek prospective injunctive relief and thus he could seek to represent classes seeking such relief.

### B.  ICE's Post-Commencement Cancellation of the Detainer

As a final matter, the Government argues that ICE's cancellation of the detainer against Gonzalez within hours after he brought suit shows that he never had a Fourth Amendment claim because LASD never detained him

pursuant to the detainer. In making this argument, the Government mistakes for a merits issue what is plainly a mootness inquiry. *See Friends of the Earth*, 528 U.S. at 189 (explaining that "[a] case might become moot if subsequent events make it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur").

Mootness is the requirement that "an actual, ongoing controversy exist at all stages of federal court proceedings." *Pitts v. Terrible Herbst, Inc.*, 653 F.3d 1081, 1086 (9th Cir. 2011) (citing *Burke v. Barnes*, 479 U.S. 361, 363 (1987)). "The question is not whether the precise relief sought at the time the case was filed is still available, but whether there can be any effective relief." *Bayer v. Neiman Marcus Grp.*, 861 F.3d 853, 862 (9th Cir. 2017) (citation and internal quotation marks omitted). "The party asserting mootness bears the heavy burden of establishing that there remains no effective relief a court can provide." *Id*. The Government comes nowhere near meeting that burden; indeed, it fails to even argue that its cancellation of the detainer mooted Gonzalez's individual claims, although the district court expressly addressed whether Gonzalez's claims were mooted by subsequent events. The court determined that Gonzalez's claims are subject to the "inherently transitory" exception to mootness. *See Pitts*, 653 F.3d at 1090–91. We agree with the district court's conclusion and thus reject the Government's argument here.

## II. The Certification of the Probable Cause Subclass

We turn next to the Government's challenge to the district court's certification of the Probable Cause Subclass

with Gonzalez as its representative.[11] Because both injunctions grant relief to the Probable Cause Subclass, we must first address the propriety of the district court's certification of this class. *See Meredith v. Oregon*, 321 F.3d 807, 814 (9th Cir. 2003).

The party seeking certification must satisfy Rule 23(a)'s prerequisites and must establish that the proposed class qualifies as a certifiable class pursuant to Rule 23(b). *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 979–80 (9th Cir. 2011). District courts have "broad discretion to determine whether a class should be certified, and to revisit that certification throughout the legal proceedings before the court." *United Steel, Paper & Forestry, Rubber, Mfg. Energy v. ConocoPhillips Co.*, 593 F.3d 802, 810 (9th Cir. 2010) (citation omitted). Our review of the district court's grant of class certification is "noticeably more deferen[tial]" than for a denial of certification. *Senne*, 934 F.3d at 926. With these principles in mind, we address the Government's arguments concerning the Rule 23(a) prerequisites and the Rule 23(b)(2) certification of the Probable Cause Subclass.

## A. The Rule 23(a) Prerequisites

Pursuant to Rule 23(a), "one or more members of a class may sue . . . as representative parties" if there is numerosity, commonality, typicality, and adequacy. Fed. R. Civ. P. 23(a). We must engage in a "'rigorous analysis' of each Rule 23(a) factor[.]" *Ellis*, 657 F.3d at 980 (quoting *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 161 (1982)). The

---

[11] The Government has not challenged the district court's certification of the Judicial Determination Class. That issue is therefore waived. *Padgett v. Wright*, 587 F.3d 983, 985 n.2 (9th Cir. 2009).

Government challenges only the district court's commonality, typicality, and adequacy findings.

### 1. Commonality

A finding of commonality requires "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "All questions of fact and law need not be common to satisfy the [commonality requirement]. The existence of shared legal issues with divergent factual predicates is sufficient[.]" *Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1041 (9th Cir. 2012) (citation omitted). A plaintiff must "demonstrate that the class members have suffered the same injury," which means that "[t]heir claims must depend upon a common contention." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349–50 (2011) (citation and internal quotation marks omitted). But "a common contention need not be one that will be answered, on the merits, in favor of the class." *Stockwell v. City & County of San Francisco*, 749 F.3d 1107, 1112 (9th Cir. 2014) (citation and internal quotation marks omitted). The Government asserts that the district court abused its discretion in finding commonality. We disagree.

At class certification, Plaintiffs proffered evidence that, in Southern California, "ICE issues . . . approximately seventy percent [] of its detainers relying only on electronic database checks to determine whether there is probable cause for detainment." *Roy*, 2016 WL 5219468, at *3, 11. The district court thus found that the Probable Cause Subclass satisfied commonality because they alleged that the Government has an "unlawful policy to base probable cause determinations on only a check of an online database." *Id.* at *14. We see no error here. Indeed, we have already held that "in a civil-rights suit . . . commonality is satisfied where the lawsuit challenges a system-wide practice or policy that affects all of the putative class members." *Armstrong v.*

*Davis*, 275 F.3d 849, 868 (9th Cir. 2001) (abrogated on other grounds by *Johnson v. California*, 543 U.S. 499 (2005) as recognized in *B.K. by next friend Tinsley v. Snyder*, 922 F.3d 957, 974 (9th Cir. 2019)); *see also La Duke v. Nelson*, 762 F.2d 1318, 1332 (9th Cir. 1985) (concluding that "[p]lainly, the constitutionality of the INS ranch check technique as it affects the defined class is a 'question of law or fact common to the class'"), *as amended*, 796 F.2d 309 (9th Cir. 1986).

Moreover, the claims of the Probable Cause Subclass turn on the Fourth Amendment's requirement of "a fair and reliable determination of probable cause as a condition for any significant pretrial restraint of liberty." *Baker v. McCollan*, 443 U.S. 137, 142 (1979) (citing *Gerstein*, 420 U.S. at 103). Because the class is defined as those individuals against whom ICE issued a detainer based solely on searches of electronic databases, ICE's policy of making probable cause determinations based solely on such searches is the "glue" that holds the class together. *See Parsons v. Ryan*, 754 F.3d 657, 678 (9th Cir. 2014) (explaining that the "police and practices" "to which all members of the class are subjected" "are the 'glue' that holds together the putative class and the putative subclass; either each of the policies and practices is unlawful as to every inmate or it is not."). A determination concerning the reliability of the system of databases on which the Government relies will resolve Plaintiffs' claims on a classwide basis.[12] *See Dukes*, 564 U.S. at 350.

---

[12] Although Plaintiffs did not need to prove the merits of their Fourth Amendment claim for the district court to find commonality, the court observed that Plaintiffs had introduced evidence undermining the legality of ICE's reliance on the databases, including that the databases

The Government's assertions of error here conspicuously conflate Rule 23(b)(3)'s predominance requirement with commonality under Rule 23(a)(2). The Government points to *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997), to suggest that the range of individual circumstances that may surround the issuance of an individual detainer preclude commonality. But, in *Amchem*, the Supreme Court upheld the denial of certification of a Rule 23(b)(3) class. The Court explained that "the predominance criterion [of Rule 23(b)(3)] is *far more demanding*" than the commonality requirement of Rule 23(a)(2). *Id*. at 624 (emphasis added). There, in the context of a case that did not involve a challenge to a single policy or practice of a single defendant, the court determined that certification pursuant to Rule 23(b)(3) was improper because individual questions predominated over common questions. *Id.* at 624–25. The Probable Cause Subclass, however, is not a Rule 23(b)(3) class and thus need only satisfy Rule 23(a)(2)'s "less demanding" commonality requirement. *Stockwell*, 749 F.3d at 1113. We can find no abuse of discretion pursuant to a standard that does not actually apply here.

The Government also reprises its argument against class certification in the district court that "probable cause is a highly fact specific inquiry." *Roy*, 2016 WL 5219468, at *14. The Government argues that probable cause "depends on the totality of the circumstances" surrounding an individual arrest, *Maryland v. Pringle*, 540 U.S. 366, 371 (2003), including the "experience and specialized training" of the officer, *United States v. Arvizu*, 534 U.S. 266, 273

---

are "outdated and not updated properly" and that ICE relies on "either no or inconclusive evidence" in the databases to make probable cause determinations. *Roy*, 2016 WL 5219468, at *3–4.

(2002). Contending that a database search is but one part of the totality-of-the-circumstances analysis, the Government asserts that the lawfulness of an individual detainer must be assessed on its own terms "even if the database alone is unreliable." The district court rejected this argument, explaining that "the Probable Cause Subclass does not challenge whether ICE actually had probable cause; rather, it challenges the alleged practice of basing probable cause only on information contained in an online database . . ." *Roy*, 2016 WL 5219468, at \*14. The district court correctly rejected the Government's argument.

Although we have no doubt that "[t]he constitutional validity of a warrantless search is pre-eminently the sort of question which can only be decided in the concrete factual context of [an] individual case," that question is "*quite different* from the question of the *adequacy of the procedur*[*es*]" on which the government relies to make arrests and detain individuals. *Sibron v. New York*, 392 U.S. 40, 58 (1968) (emphasis added). On the latter issue, Fourth Amendment claims concerning government policies, practices or procedures for probable cause determinations are plainly suitable for classwide resolution. *See McLaughlin*, 500 U.S. at 47, 58–59 (considering the legality of a county's policy and practice of combining probable cause determinations with its arraignment procedures, which resulted in delays before receipt of probable cause determinations); *Gerstein*, 420 U.S. at 116–19 (considering the Fourth Amendment claims of a certified Rule 23(b)(2) class of individuals subject to pretrial detention who challenged a state law procedure concerning probable cause determinations). Because the claims here are such a challenge, the district court did not err in finding commonality.

### 2. Typicality[13]

The claims of the representative party must be typical of the class claims. Fed. R. Civ. P. 23(a)(3). This "inquiry focuses on the *nature of the claim* . . . of the class representative, and not . . . the specific facts from which it arose." *Ramirez v. TransUnion LLC*, 951 F.3d 1008, 1033 (9th Cir. 2020) (citation and internal quotation marks omitted) (emphasis added). "[W]hether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct" inform the analysis. *Hanon v. Dataproducts Corp*., 976 F.2d 497, 508 (9th Cir. 1992) (citation omitted). Rule 23(a)(3) is "permissive" and requires nothing more than that a class plaintiff's claims be "reasonably coextensive with those of absent class members." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998). We address in turn the Government's assertions of atypicality due to (a) Gonzalez's U.S. citizenship and (b) Gonzalez's circumstances.

#### a. Gonzalez's U.S. Citizenship

The Government asserts that Gonzalez, as a U.S. citizen, is atypical of the class because it includes noncitizens. We disagree.

#### i. 8 U.S.C. § 1252(b)(9)

The Government argues that Gonzalez is atypical of unnamed noncitizen class members over whose claims the

---

[13] The Government's challenge to adequacy is coextensive with its challenge to Gonzalez's typicality. Thus, our analysis here applies equally to adequacy.

district court lacked subject matter jurisdiction pursuant to 8 U.S.C. § 1252(b)(9). "The usual rule in class actions is that to establish subject matter jurisdiction one looks only to the named plaintiffs and their claims." *Pruell v. Caritas Christi*, 645 F.3d 81, 83 (1st Cir. 2011). The Government implicitly concedes that § 1252(b)(9) could not affect jurisdiction over *Gonzalez's* claims. Nevertheless, we will assume that whether the district court would have jurisdiction over the claims of unnamed noncitizen class members is relevant here.

Section 1252(b)(9), titled "[c]onsolidation of questions for judicial review," provides that "[j]udicial review of all questions of law and fact . . . arising from any action taken or proceeding brought to remove an alien from the United States . . . shall be available only in judicial review of a final order" of removal and "no court shall have jurisdiction . . . . to review such an order or such questions of law or fact" other than through a review of a final order of removal. 8 U.S.C. § 1252(b)(9). We have described § 1252(b)(9) as "vise-like in grip," channeling jurisdiction over "any issue—whether legal or factual—arising from any removal-related activity" to the courts of appeal through a petition for review of a final order of removal. *J.E.F.M. v. Lynch*, 837 F.3d 1026, 1031 (9th Cir. 2016) (internal quotation marks omitted) (emphasis omitted). But we have also explained that "§ 1252(b)(9) has built-in limits," specifically, "claims that are independent of or collateral to the removal process do not fall within the scope of § 1252(b)(9)." *Id.* at 1032.

The Supreme Court has since instructed that § 1252(b)(9) is a "targeted" and "narrow" provision that "is certainly not a bar where, as here, the parties are not challenging any removal proceedings." *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 140 S. Ct. 1891, 1907

(2020).  The Probable Cause Subclass is defined to *exclude* individuals against whom there is a final order of removal as well as any individual subject to ongoing removal proceedings.  The Government has also admitted that an immigration detainer is *not* an administrative warrant for the arrest of an individual on civil immigration charges.  As in *Regents*, § 1252(b)(9) is not a bar to jurisdiction over the claims of any class members—noncitizen or U.S. citizens— because none "ask[s] for review of an order of removal, the decision to seek removal, or the process by which removability will be determined."  *Id.* (cleaned up); *see also E. Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1269 (9th Cir. 2020) (observing that "[§] 1252(b)(9) . . . applies only to removal orders. . . .").

Section 1252(b)(9) is also not a bar to jurisdiction over noncitizen class members' claims because claims challenging the legality of detention pursuant to an immigration detainer are independent of the removal process.  *See Aguilar v. ICE*, 510 F.3d 1, 11 (1st Cir. 2007) (reading "arising from" "to exclude claims that are independent of, or wholly collateral to, the removal process" and identifying "challenges to the legality of detention" as squarely outside § 1252(b)(9)'s scope); *Hernández v. Gonzales*, 424 F.3d 42, 42–43 (1st Cir. 2005) (holding that detention claims are independent of removal proceedings and, thus, not barred by section 1252(b)(9)).  Because § 1252(b)(9) does not bar jurisdiction over the claims of noncitizen class members here, it cannot render Gonzalez atypical.

### ii.  Rebuttable Presumption of Alienage

The Government also argues that Gonzalez is atypical of noncitizen class members because evidence of foreign birth—"even with citizen-class members"—gives rise to a

rebuttable presumption of alienage on which an immigration officer may rely as part of a probable cause determination, which does not apply to "someone who is or who the government should have known is a citizen.**[14]**  Setting aside that the challenge here concerns the legality of a policy that applies equally to all class members, the Government makes no suggestion that it raised this atypicality argument in the district court, and the class certification order suggests that the Government did not do so.  *See Roy*, 2016 WL 5219468, at \*15.  Although we may consider an argument raised for the first time on appeal in "exceptional circumstances," *Club One Casino, Inc. v. Bernhardt*, 959 F.3d 1142, 1153 (9th Cir. 2020), the Government does not argue that such circumstances apply nor do we see any.  The Government conceded in the district court that "evidence of foreign birth and no match in a federal immigration database is not probable cause of removability."  A party remains bound by a concession in the district court notwithstanding a contrary position on appeal.  *See Reynoso v. Giurbino*, 462 F.3d 1099, 1110 (9th Cir. 2006).  Thus, we deem the argument waived.

### b.  Gonzalez's Individual Circumstances

Finally, the Government asserts that Gonzalez is also atypical in light of the circumstances pertaining to his immigration detainer.  The Government first argues that Gonzalez is unlike other class members detained pursuant to an immigration detainer because it cancelled the detainer against him within hours after he filed this suit.  By

---

**[14]** The Government relies on our decision in *Scales v. I.N.S.*, 232 F.3d 1159 (9th Cir. 2000), for this argument.  *Scales*, however, concerned a presumption in a burden-shifting framework in removal proceedings.  *Id.* at 1163.  We did not hold that, nor consider whether that presumption applies to a probable cause determination of removability.

concluding that his claims fall within the inherently transitory exception to mootness, the district court evaluated his claims as they stood before the Government's cancellation of the detainer.  Although the Government asserts that the court confused mootness with whether Gonzalez's claims are typical, the Government does not identify any authority showing the court's analysis to be erroneous.  A bare assertion of error does not establish an abuse of discretion.

The Government argues further that because an LAPD officer incorrectly wrote on Gonzalez's booking record that he was born in Mexico, Gonzalez has "unique" circumstances that make him atypical.  The Government ignores its own stipulation in the district court that an ICE agent "issued Plaintiff Gonzalez's detainer" because one database—the Los Angeles County Consolidated Criminal History System—"erroneously stated that [he] was born in Mexico and no records of Plaintiff Gonzalez were found in [two other databases] showing that [he] legally entered the United States or was legally present in the United States." Howsoever the error was introduced into one of the databases, it was nonetheless an error in a database on which ICE relied to determine whether Gonzalez was removable, as the district court acknowledged at class certification.  *See Roy*, 2016 WL 5219468, at *3, 15.  Gonzalez's claim is thus no different than any other class member who challenges the Government's issuance of an immigration detainer based solely on a search of electronic databases.  Gonzalez is typical of the class.  Thus, the district court did not abuse its discretion in concluding that the Probable Cause Subclass satisfied Rule 23(a)'s prerequisites.

### B. The Certification of the Class Pursuant to Rule 23(b)(2)

The district court properly certified the Probable Cause Subclass as a Rule 23(b)(2) class. *Id*. at \*21. Rule 23(b)(2) provides that "[a] class action may be maintained if Rule 23(a) is satisfied and if . . . the party opposing the class has acted . . . on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class." *Jennings v. Rodriguez*, 138 S. Ct. 830, 852 (2018) (citation omitted). The Probable Cause Subclass is narrowly defined to include only those individuals against whom ICE issued an immigration detainer pursuant to its policy of relying solely on a search of electronic databases to make a probable cause determination. The district court properly concluded that a determination about the lawfulness of this policy under the Fourth Amendment and corresponding injunctive or declaratory relief would provide relief to the entire class. *See Roy*, 2016 WL 5219468, at \*21. The Government's assertions of error here repeat the Government's challenges to commonality. Because we have already rejected those arguments, they fail here as well. Thus, the district court did not abuse its discretion in concluding that the Probable Cause Subclass satisfied Rule 23(b)(2). Accordingly, we affirm the district court's certification of this class.

## III. Jurisdiction to Order Injunctive Relief for the Detainer Claims

Before we turn to the merits of the State Authority and Database Injunctions, we must also consider the Government's assertion that 8 U.S.C. § 1252(f)(1) precludes

the injunctive relief that the district court granted for the detainer claims underlying the classwide injunctions.  The plain language of § 1252(f)(1) and the relevant statutory provisions compel us to reject the Government's assertion.

Section 1252(f)(1) is straightforward.  It provides that:

> Regardless of the nature of the action or claim . . . , no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter, as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated.

8 U.S.C. § 1252(f)(1).  "Part IV" is a reference to the provisions titled "Inspection, Apprehension, Examination, Exclusion, and Removal," which currently include 8 U.S.C. §§ 1221–1232 of the INA.

By its terms, § 1252(f)(1) does not, as the dissent imagines, categorically insulate immigration enforcement from "judicial classwide injunctions."  Section 1252(f)(1) places limitations on the jurisdiction and authority of district and circuit federal courts to grant injunctive relief that restrains or enjoins the operation of §§ 1221–1232.  *See Jennings,* 138 S. Ct. at 851; *Reno v. Am.-Arab Anti-Discrimination Comm*., 525 U.S. 471, 481 (1999).  But by specifying only "the provisions of Part IV" and reinforcing its focus on only "*such* provisions," 8 U.S.C. § 1252(f)(1) (emphasis added), the statute's plain text makes clear that its limitations on injunctive relief do *not* apply to *other*

provisions of the INA.  Unremarkably, we have repeatedly recognized this textual limitation.  *See Catholic Soc. Servs. v. I.N.S.*, 232 F.3d 1139, 1150 (9th Cir. 2000) (en banc) (upholding a preliminary injunction because it was issued under "Part V" of the subchapter and thus "by its terms, the limitation on injunctive relief [in § 1252(f)(1)] does not apply to the preliminary injunction granted by the district court"); *see also Gonzales v. Dep't of Homeland Sec.*, 508 F.3d 1227, 1233 (9th Cir. 2007) (concluding that § 1252(f)(1) did not bar injunction concerning application of statutory provisions regarding adjustment of status because "as in the *Catholic Social Services* injunction, [the injunction] directly implicates the adjustment of status provision which falls *under part V of subchapter II*, notwithstanding that a reinstatement proceeding may be a collateral consequence of an unsuccessful adjustment application." (emphasis added)).

The Government tells us that the injunctions contravene § 1252(f)(1) because its detainer authority is "now codified in, among other statutes, [] §§ 1226 and 1231, both covered by § 1252(f)(1)."    But the Government predicates that argument on its detainer regulation, 8 C.F.R. § 287.7.**[15]** "An administrative regulation, of course, is not a 'statute.'" *United States v. Mersky*, 361 U.S. 431, 437 (1960).  And, by its clear terms, § 1252(f)(1), places limitations only on injunctive relief that would "enjoin or restrain the operation of *the provisions of Part IV*[.]"    8 U.S.C. § 1252(f)(1) (emphasis added).  The regulation is not a provision of Part

---

**[15]** Although we reject the Government's argument for other reasons, we observe that the Government's argument in part rewrites its own regulation, which does not even refer to § 1231.  *See* 8 C.F.R. § 287.7.

IV, and thus cannot run afoul of § 1252(f)(1).[16] Relatedly, Plaintiffs' challenge to the legality of the Government's detainer policies and procedures at issue here could not run afoul of § 1252(f)(1) because such procedures are not—as the Government concedes—even codified in the statutory provisions that § 1252(f)(1) encompasses. *See Grace v. Barr*, 965 F.3d 883, 907 (D.C. Cir. 2020) (explaining that § 1252(f)(1) "refers only to 'the operation of the provisions'—i.e., the statutory provisions themselves, and thus places no restriction on the district court's authority to enjoin *agency action* found to be unlawful." (emphasis in original)).

The Government's assertions here avoid statutory text because none of the provisions of Part IV, let alone §§ 1226 and 1231, even refer to "detainers." *See generally* 8 U.S.C. §§ 1221–1232. The only provision of the INA whose plain language refers to "detainers" is located in 8 U.S.C. § 1357 ("Powers of immigration officers and employees"), a statutory provision contained in Part IX. *See* 8 U.S.C. § 1357(d). That provision provides for the issuance of

---

[16] We recognize that Congress has authorized the promulgation of regulations to carry out the provisions of the INA. *See* 8 U.S.C. § 1103. Whether the detainer regulation is valid pursuant to this grant of general authority, *see Comm. for Immigrant Rights of Sonoma Cty. v. Cty. of Sonoma*, 644 F. Supp. 2d 1177, 1199 (N.D. Cal. 2009), is not a question that we decide here. What matters here is that that general grant of authority is *not* located in "Part IV." Nor, as we discuss shortly, is the only statutory provision that even refers to immigration detainers. *See* 8 U.S.C. § 1357(d). These deliberate structural choices by Congress— both in § 1252(f)(1) and elsewhere in the INA—determine whether § 1252(f)(1)'s limitations preclude the issuance of injunctive relief concerning detainers by district and circuit courts. *See Nken v. Holder*, 556 U.S. 418, 431 (2009) ("[T]he Court frequently takes Congress's structural choices into consideration when interpreting statutory provisions.").

immigration detainers only when an individual is arrested for a controlled substance offense and is a suspected alien. *Id.* We have already recognized that "[t]he INS *has authority* to lodge a detainer against a prisoner under 8 U.S.C. § 1357(d)." *McLean v. Crabtree*, 173 F.3d 1176, 1185 n.12 (9th Cir. 1998). The Supreme Court has also recognized the distinct role that § 1357(d) plays in federal immigration law enforcement with state officials. *See Arizona v. United States*, 567 U.S. 387, 410 (2012) ("State officials can also assist the Federal Government by responding to requests for information about when an alien will be released from their custody." (citing 8 U.S.C. § 1357(d))). The upshot is that § 1357(d) is not located in Part IV, and thus § 1252(f)(1)'s limitations do not apply.[17] *See Gonzales*, 508 F.3d at 1233; *Catholic Soc. Servs.*, 232 F.3d at 1150.

---

[17] Although its own detainer regulation is titled "detainer provisions under section 287(d)(3) of the Act"—a reference to § 1357(d)—and identifies detainers as "issued pursuant to" § 1357, *see* 8 C.F.R. § 287.7(a), the Government conspicuously ignored § 1357(d) in its opening brief. In its reply brief, the Government acknowledged § 1357(d) for the first time, but only to explain it away as a mere statutory road bump to the conclusion that any detainer authority necessarily arises from the provisions that § 1252(f)(1) encompasses. The dissent embraces the Government's approach but goes further. The dissent conjectures that § 1357(d)—a provision that the Government's own detainer regulation cites three times as a basis for issuing immigration detainers—does not actually authorize detainers at all. We cannot agree with either the Government or the dissent for the simple reason that we are not free to ignore Congress's choice to locate the only statutory reference to immigration detainers outside the provisions that § 1252(f)(1) encompasses, even if we might disagree with that choice as a policy matter. *See United States v. State of Washington*,—F.3d—, 2020 WL 4814127, at *6 (9th Cir. Aug. 19, 2020); *Planes v. Holder*, 652 F.3d 991, 996 (9th Cir. 2011) (explaining that we are not free to stray from statutory text "[r]egardless of our view on the wisdom or efficacy of Congress's policy choices").

Unable to anchor its arguments in the text of §§ 1226 or 1231, the Government tells us that its detainer authority is nonetheless *implied* under those provisions, and thus § 1252(f)(1)'s limitations apply.**[18]** The dissent embraces this argument, relying on a single unpublished district court decision to surmise that any implied detainer authority must necessarily arise under the provisions that § 1252(f)(1) encompasses. *See Santoyo v. United States*, No. 5:16-CV-855-OLG, 2017 WL 6033861, at 3* (W.D. Tex. Oct. 18, 2017). We cannot, however, "create[] out of thin air" statutory text that does not exist. *Hamama v. Adduci*, 912 F.3d 869, 879 (6th Cir. 2018); *see also Ariz. State Bd. for Charter Sch. v. U.S. Dep't of Educ.*, 464 F.3d 1003, 1007 (9th Cir. 2006) (observing that a court may not add or subtract statutory text). That is particularly true here. Whereas Congress did not include any reference to immigration detainers among the provisions to which § 1252(f)(1)'s limitations apply, Congress codified immigration detainers in a provision to which the limitations of § 1252(f)(1) do *not* apply. We must presume that Congress acted intentionally. *See Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438, 452 (2002) ("When Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (citation and internal quotation marks omitted)).

Although the Government attempts to conjure an implied detainer authority in the shadow of §§ 1226 and 1231, we

---

**[18]** The classes exclude individuals for whom a detainer issued pursuant to a final order of removal. Thus, the injunction could not restrain or enjoin the operation of § 1231 for this additional reason. Nevertheless, we address the Government's arguments on their terms.

observe further that the detainers here do not directly implicate the authority of those provisions. Section 1231 codifies the Attorney General's authority to remove and detain aliens who are already subject to a final order of removal. 8 U.S.C. § 1231(a)(2), (6). The classes in this case, however, exclude individuals to whom the Government issues a detainer due to a final order of removal. Section 1226 in turn authorizes "the Attorney General" to arrest aliens "[o]n a warrant" and detain them pending removal proceedings. *Id.* § 1226(a), (c); *see also Jennings*, 138 S. Ct. at 838 (explaining that "[§] 1226 governs the process of arresting and detaining [certain] aliens pending their removal"). But it is undisputed that a detainer is not a warrant of any kind. More critically, neither DHS, nor ICE arrests or detains any individual by issuing an immigration detainer to a state or local LEA. Instead, DHS and ICE rely on the LEA to do so. Although the Government may use detainers issued to state and local LEAs with the purpose of arresting and detaining a suspected alien, the possibility that the Government may eventually arrest and detain an individual by virtue of the detainers at issue here is of no moment because the INA provisions directly implicated by such detainers fall outside § 1252(f)(1)'s scope.[19]

---

[19] Congress has addressed the arrest and detention authority of state and local LEAs for aliens, and delimited ICE's role in provisions to which § 1252(f)(1)'s limitations do not apply. *See* 8 U.S.C. § 1252c(a) (provision located in Part V and is thus also outside the scope of § 1252(f)(1)). And Congress has addressed elsewhere ICE's authority to make a warrantless arrest of an individual who ICE has "reason to believe" is a removable alien, 8 U.S.C. § 1357(a)(2), the authority of state and local LEAs to carry out federal immigration functions, *id.* § 1357(g), and the ability of such LEAs to cooperate with the Federal Government specifically on the issue of detainers, *id.* § 1357(d). None of these provisions is located in Part IV.

Our task here is simple: "when the express terms of a statute give us one answer and extratextual considerations suggest another, it's no contest. Only the written word is the law, and all persons are entitled to its benefit." *Bostock v. Clayton County*, 140 S. Ct. 1731, 1737 (2020).[20] The written word of the INA is quite clear: none of the provisions that § 1252(f)(1) encompasses refers to immigration detainers. It follows that § 1252(f)(1)'s limitations on injunctive relief do not apply, and thus do not compel vacatur of the injunctions for lack of jurisdiction or authority by the district court to grant such relief. We therefore turn to the merits of the injunctions.

## IV.    The State Authority Injunction

The State Authority Injunction permanently enjoins ICE "from issuing detainers seeking the detention of Probable Cause Subclass members to law enforcement agencies in states that lack state law permitting state and local law enforcement agencies to make civil immigration arrests based on civil immigration detainers only."

Plaintiffs contend that this injunction is "merely an alternative basis" on which the district court granted relief to the Probable Cause Subclass. Because the class is defined in part by ICE's reliance on electronic database searches to issue immigration detainers, Plaintiffs argue that we should

---

[20] The dissent objects to the analysis here in part because of the consequences that it speculates will ensue, namely, that some future plaintiffs could challenge the regulation, or the possibility that the Government's detainer "enforcement tools" could be affected by an injunction at some point. These extratextual considerations are insufficient to tip the statutory scales in favor of the Government's desired outcome, or the dissent's approach. *See Bostock*, 140 S. Ct. at 1737.

limit our analysis to the Database Injunction to avoid the constitutional issues underlying the State Authority Injunction. We are unpersuaded. That both injunctions pertain to the same class does not render "alternative" the State Authority Injunction's imposition of, as Plaintiffs recognize, "totally independent" restrictions with distinct legal and factual issues. There are also no constitutional questions to avoid because, as discussed in Part V, the Database Injunction is infirm. Thus, we must decide the merits of the State Authority Injunction.[21]

At the outset, we must clarify what we do *not* decide here. In issuing the State Authority Injunction, the district court relied on principles of preemption and federalism to reason that a state "must consent to the delegation of federal immigration functions," in the absence of which ICE violates the Fourth Amendment by issuing an immigration detainer. *Gonzalez*, 416 F. Supp. 3d at 1015. But neither Plaintiffs' operative complaint, nor the final pre-trial order hinted at claims against the Government premised on preemption or federalism. Here, Plaintiffs disavow reliance on preemption principles. And, although we have noted the federalism concerns that immigration detainers may raise, *City & County of San Francisco v. Trump*, 897 F.3d 1225, 1241 n.7 (9th Cir. 2018), Plaintiffs do not raise and have therefore waived any federalism arguments concerning the State Authority Injunction. *See United States v. Dreyer*,

---

[21] The Government perfunctorily suggests that the State Authority Injunction is invalid because the district court permitted Plaintiffs to raise the underlying claim before trial. The Government, however, failed to brief and thus has waived this issue. *Cal. Pac. Bank v. Fed. Deposit Ins. Corp.*, 885 F.3d 560, 570 (9th Cir. 2018).

804 F.3d 1266, 1277 (9th Cir. 2015) ("[A]n appellee waives any argument it fails to raise in its answering brief.").

The only issue that we must decide is whether state law restrictions on the authority of state or local officers to enforce federal civil immigration law determine whether the Government violates the Fourth Amendment by issuing an immigration detainer. The Supreme Court's decision in *Virginia v. Moore*, 553 U.S. 164 (2008), instructs that the answer is "no."

In *Moore*, the defendant was charged with possession of cocaine with intent to distribute after Virginia state officers discovered crack cocaine on him as part of a search incident to his warrantless arrest for the misdemeanor of driving with a suspended license. *Id*. at 166–67. Moore moved to suppress the crack cocaine on the ground that his arrest violated the Fourth Amendment because driving with a suspended license was not an arrestable offense in Virginia and thus the officers lacked authority to arrest him. *Id*. at 167–68. In reversing the trial court's denial of the motion, the Virginia Supreme Court "reasoned that since the arresting officers should have issued Moore a citation under state law, and the Fourth Amendment does not permit search incident to citation, the arrest search violated the Fourth Amendment." *Id*. at 168. The United States Supreme Court reversed.

Two aspects of the Court's analysis are key here. First, the Court reinforced the primacy of probable cause in the evaluation of whether a warrantless arrest comports with the Fourth Amendment. *Id.* at 171 ("[W]hen an officer has probable cause to believe a person committed even a minor crime . . . the arrest is constitutionally reasonable."); *id.* at 173 ("[A]n arrest based on probable cause serves interests that have long been seen as sufficient to justify the

seizure."); *id.* at 174–75 (explaining that even if state law restrictions somehow altered the policy interests, the Court "would adhere to the probable-cause standard . . . because of the need for a bright-line constitutional standard"). Second, the Court squarely rejected the notion that "state-law arrest limitations" dictate whether a Fourth Amendment violation has occurred. *Id*. at 175. The Court explained that "linking Fourth Amendment protections to state law would cause them to 'vary from place to place and from time to time.'" *Id*. at 176 (quoting *Whren v. United States*, 517 U.S. 806, 815 (1996)). To avoid the "vague and unpredictable" consequences of tethering the Fourth Amendment to the laws of the fifty states, *id.* at 175, the Court held that "state restrictions do not alter the Fourth Amendment's protections," *id*. at 176. In resolving the case, the Court concluded that even if Moore's arrest violated state law, "it is not the province of the Fourth Amendment to enforce state law." *Id*. at 178. Because the officers had probable cause to believe that Moore violated state law by driving with a suspended license, his warrantless arrest and ensuing search were constitutional. *Id.*

Plaintiffs tell us that *Moore* is distinguishable because it concerned criminal rather than civil arrests. We do not understand why that distinction matters to the general Fourth Amendment principles that *Moore* articulated concerning warrantless arrests and seizures. It is undisputed that an immigration detainer requests detention of an individual. "Detention, of course, is a type of seizure of the person to which Fourth Amendment protections attach." *Alcocer v. Mills*, 906 F.3d 944, 953 (11th Cir. 2018). Moreover, those protections apply in the civil immigration context. *United States v. Brignoni-Ponce*, 422 U.S. 873, 881–82, 884 (1975); *Alcocer*, 906 F.3d at 953 ("[T]he Supreme Court long ago held that, beyond a *Terry* stop, any detention of a suspected

alien 'must be based on consent or probable cause' that the person is, in fact, an alien.'" (citation omitted)); *Tejeda-Mata v. Immigration & Naturalization Serv.*, 626 F.2d 721, 724–25 (9th Cir. 1980) (applying "the constitutional requirement of probable cause" to immigration arrests).

Critically, we have already applied *Moore* to conclude that the absence of state authorization for a state officer to enforce federal immigration law does not render the officer's seizure of an individual for the suspected *civil* immigration offense of unlawful presence in the United States a Fourth Amendment violation. *See Martinez-Medina v. Holder*, 673 F.3d 1029, 1031–32 (9th Cir. 2011). There, the petitioners sought to suppress evidence of alienage for an allegedly egregious Fourth Amendment violation. *Id.* at 1036. They argued that an Oregon deputy sheriff who had arrested them lacked state law authority to do so, pointing to a provision of Oregon law that expressly forbade law enforcement agencies from apprehending someone whose only violation of law was the violation of federal immigration law. *Id.* (citing Or. Rev. Stat. § 181.850). "We assume[d], without deciding, that the deputy sheriff, like the officers in *Moore*, violated state law when he apprehended the aliens without the authority to do so." *Id.* at 1037. We nonetheless held that "the deputy sheriff's violation of Oregon law does not constitute a violation of the Fourth Amendment" and thus "cannot be the basis for finding an egregious Fourth Amendment violation." *Id.* at 1036 (citing *Moore*, 553 U.S. at 173–74). We concluded that "like the state law violation in *Moore*, the deputy sheriff's violation of Oregon law does not constitute a Fourth Amendment violation." *Id.* at 1037. *Martinez-Medina* thus confirms *Moore*'s application here.

In finding for Plaintiffs on the State Authority Claim and entering the resulting State Authority Injunction, the district court erred by failing to account for *Moore* and *Martinez-Medina*. *See Gonzalez*, 416 F. Supp. 3d at 1015–16. The court thereby concluded that the Government violates the Fourth Amendment by issuing a detainer to state or local LEAs in a state that does not authorize federal civil immigration enforcement.[22] *Id.* Thus, even when the Government has probable cause of removability, the Government would nevertheless violate the Fourth Amendment due to the happenstance of the state in which an individual is located when ICE issues a detainer.

*Moore*, however, rejected the unpredictability and vagaries of such a regime with a bright-line rule: the constitutionality of a warrantless arrest under the Fourth Amendment does not depend on whether state law authorizes state or local officers to make the arrest, but on whether there is probable cause. *Moore*, 553 U.S. at 171, 176–78; *Martinez-Medina*, 673 F.3d at 1036–37; *Brobst*, 558 F.3d at 989 (concluding that *Moore* forecloses reliance on state law to determine whether a seizure violates the Fourth Amendment); *United States v. Turner*, 553 F.3d 1337, 1346 (10th Cir. 2009) (applying *Moore* to conclude that "because arrests made in violation of state law are not *per se* unreasonable under the Fourth Amendment, it does not matter for the purposes of our analysis whether [state

---

[22] The district court relied on the plurality decision in *Ker v. California*, 374 U.S. 23, 37 (1963), for the proposition that "under the Fourth Amendment . . . the lawfulness of arrests for federal offenses is to be determined by reference to state law." *Gonzalez*, 416 F. Supp. 3d at 1016. We, however, have already explained that *Moore* "distinguishes *Ker*," including, as is relevant here, that *Ker* did not concern a federal offense. *United States v. Brobst*, 558 F.3d 982, 989–90 (9th Cir. 2009). Thus, the district court erred in relying on *Ker*.

officers] had jurisdictional authority under state law, as long as the officers' actions were otherwise reasonable"). That issue concerns the Database Claim and Database Injunction.[23]  But because "state restrictions do not alter the Fourth Amendment's protections," *Moore*, 553 U.S. at 17, the district court erred in concluding otherwise and abused its discretion in entering the State Authority Injunction. We therefore reverse and vacate the State Authority Injunction.

## V.  The Database Injunction

Plaintiffs have challenged the Government's issuance of immigration detainers from the Central District based solely on searches of electronic databases to make probable cause determinations of removability. In finding for Plaintiffs on this Database Claim, the district court concluded that the databases are unreliable for determining probable cause of removability, and thus the Government violates the Fourth Amendment by issuing detainers based solely on searches of the databases. *See Gonzalez*, 416 F. Supp. 3d at 1016–21. The court enjoined the Government from issuing detainers from the Central District based solely on searches of electronic databases to make probable cause determinations of removability.   We first outline Fourth Amendment

---

[23] The Government argues that probable cause may be imputed to state or local officers who act pursuant to an immigration detainer issued by an ICE agent who has probable cause. Two of our sister circuits have suggested as much. *See City of El Cenizo v. Texas*, 890 F.3d 164, 187 (5th Cir. 2018) (concluding that pursuant to the "collective-knowledge doctrine" "the ICE officer's knowledge may be imputed to local officials even when those officials are unaware of the specific facts that establish probable cause of removability"); *Mendoza v. U.S. Immigration & Customs Enf't*, 849 F.3d 408, 414–15 (8th Cir. 2017) (similar). Imputation of probable cause, however, requires that probable cause exist, which still leads us to the Database Claim.

principles that apply here, and then turn to the factual findings and legal conclusions underlying the injunction.

## A. Fourth Amendment Principles

The Fourth Amendment protects against unreasonable seizures by the government. U.S. Const. amend. IV. "The infringement on personal liberty of any 'seizure' of a person can only be 'reasonable' under the Fourth Amendment if we require the police to possess 'probable cause' *before* they seize him." *Terry v. Ohio*, 392 U.S. 1, 38 (1968) (emphasis added); *see also Henry v. United States*, 361 U.S. 98, 102 (1959).

"[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts— not readily, or even usefully reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232 (1983). "Neither certainty nor a preponderance of the evidence is required." *United States v. Kelley*, 482 F.3d 1047, 1050 (9th Cir. 2007). "Probable cause is not a high bar." *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018) (citation and internal quotation marks omitted). It is well-settled that a "fair and reliable determination of probable cause [is] a condition for any significant pretrial restraint of liberty." *Baker*, 443 U.S. at 142. Thus, the government must rely on "reasonably trustworthy information sufficient to warrant a prudent person in believing" that an individual has committed an offense. *Rohde v. City of Roseburg*, 137 F.3d 1142, 1144 (9th Cir. 1998) (citation omitted).

As is relevant here, the government may rely on a computer database to make a probable cause determination. *Herring v. United States*, 555 U.S. 135, 146–47 (2009). But when the government chooses "to enjoy the substantial advantages this technology confers," the government

accepts "the burden of corresponding constitutional responsibilities." *Arizona v. Evans*, 514 U.S. 1, 17–18 (1995) (O'Connor, J., concurring).     And when the government relies *solely* on a computer database to make a probable cause determination, the legality of a resulting seizure or detention "hinges entirely on the reliability of [the] computer database[.]" *United States v. Esquivel-Rios*, 725 F.3d 1231, 1238 (10th Cir. 2013) (Gorsuch, J.); *see also Morales v. Chadbourne*, 235 F. Supp. 3d 388, 401 (D.R.I. 2017) ("A database search is only successful and its results are only reliable under a probable cause analysis if the information contained in the database is complete and if the search is thorough and based on available identifiers."), *appeal dismissed*, No. 17-1300, 2017 WL 4574440 (1st Cir. May 24, 2017).

Although probable cause is "incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances," *Pringle*, 540 U.S. at 371, the reliability of a computer database may lend itself to such an inquiry. *See Esquivel-Rios*, 725 F.3d at 1237–38. A database may also have shortcomings by virtue of the data that it contains. For example, a database may lack complete records. *See Orhorhaghe v. I.N.S.*, 38 F.3d 488, 498–99 (9th Cir. 1994) (concluding that reliance on the Immigrant Index System database, which did not contain entry records predating 1983 and excluded "millions of people who are legitimately present in the United States," did not provide sufficient cause for immigration agents to seize individual for suspected illegal presence). Similarly, a database may have static or outdated information. *See Smith v. City of Oklahoma City*, 696 F.2d 784, 787 (10th Cir. 1983) (finding no probable cause for an arrest warrant when "a computer check" used pursuant to city procedure to issue the parking tickets

underlying the warrant established only who owned vehicle on the date of check, but not who owned the vehicle on earlier or later dates). But howsoever a database is unreliable, the ultimate inquiry is whether the database provides officers with "reasonably trustworthy information" for determining probable cause. *Rohde*, 137 F.3d at 1144 (citation omitted). With these principles in mind, we turn to the Database Injunction.

## B. The Errors Underlying the Database Injunction

The claims of the Probable Cause Subclass concern the Government's issuance of immigration detainers from the Central District. The Government must have probable cause to lodge an immigration detainer, *i.e.*, before an individual is detained pursuant to the detainer. *See Hernandez*, 939 F.3d at 200; *Morales v. Chadbourne*, 793 F.3d 208, 211 (1st Cir. 2015); *Cervantez v. Whitfield*, 776 F.2d 556, 560 (5th Cir. 1985). Because only an individual who is not a U.S. citizen and who lacks lawful immigration status is removable from the United States, probable cause here hinges on the information about an individual's citizenship and immigration status on which the government relies to issue a detainer. *See Brignoni-Ponce*, 422 U.S. at 884; *Orhorhaghe*, 38 F.3d at 497; *Tejeda-Mata*, 626 F.2d at 725. Moreover, because the Database Claim challenges the Government's practice of issuing immigration detainers based solely on searches of electronic databases, the probable cause determinations here hinge entirely on the reliability of the databases. *See Esquivel-Rios*, 725 F.3d at 1238.

The district court concluded "that ICE violates the Fourth Amendment by relying on an unreliable set of databases to make probable cause determinations for its detainers." *Gonzalez*, 416 F. Supp. 3d at 1018. We do not

recount all the underlying factual findings because it is unnecessary to do so. Instead, we focus on three interrelated, yet distinct errors that require reversal: (1) the district court's incomplete set of reliability findings, (2) the district court's legal error in concluding that any database is unreliable due to its intended purpose, and (3) the district court's failure to address whether the system of databases on which ICE relies routinely fails to provide sufficiently trustworthy evidence of removability.

### 1.  The Incomplete Database Reliability Findings

Throughout the district court's order are a number of sweeping, categorical conclusions about the databases on which ICE relies. *See id.* at 1011 ("All told, the collection of datapoints ICE gathers from the various databases does not provide affirmative indicia of removability to satisfy probable cause . . . because the aggregation of information ICE receives from the databases is largely erroneous and fails to capture certain complexities and nuances of immigration law."); *id*. at 1019 ("[T]he set of databases ICE checks, and the information stored therein, contain serious errors.").

These categorical findings, however, suffer from a key shortcoming: the district court did not make reliability findings for *all* the databases on which ICE relies. Although trial occurred in May 2019, the district court anchored its analysis in the databases on which ICE relied as of December 2017 and identified sixteen databases on which ICE relied at that point. *Id*. at 1007–08 & n.12. Its unreliability findings, however concerned only six databases. *Id.* at 1008–11, 18–19 (examining the CIS, CLAIMS 3 and CLAIMS 4, ADIS, SEVIS, and TECS databases). Although the court identified them, the court failed to make any findings for PCQS (Person Centric Query

Search), EOIR, EID, SQ11, SQ94, ELIS 1 & 2, the California Birth Index, the CCD database, the RAPS (Refugee, Asylum and Parole System) database, or the NCIC and NLETS databases.[24] *Id.*

Plaintiffs argue that the district court did not need to make reliability findings about all the databases on which ICE relies because they are not relevant to the Probable Cause Subclass for one reason or another. But Plaintiffs' assertions in their briefing are not findings by the district court. Moreover, contrary to Plaintiffs' arguments, the court expressly recognized that some of the databases for which it failed to make any determinations of reliability contain information that bears on probable cause determinations of removability for Probable Cause Subclass members. For example, the district court recognized that the NCIC and NLETS criminal databases "are relevant for removability purposes," but failed to assess their reliability. *Id.* at 1008. The district court also recognized that the CCD database contains information about visas for which noncitizens have applied, *id.* at 1007 n.12, but the court apparently thought that the database was irrelevant because "it is not a broad-reaching database that captures all U.S.-born citizens, *id.* at 1011 n.17. Notably, Plaintiffs offer no explanation for the district court's failure to address the NCIC, NLETS, and CCD databases.

In a case concerning the reliability of *the* databases on which ICE relies to make probable cause determinations, the district court could not make categorical findings of unreliability without actually addressing *each* database on

---

[24] The district court apparently excluded the RAPS database because "ICE is not required to search" it. *Gonzalez*, 416 F. Supp. 3d at 1011. But trial evidence showed that ICE searched that database.

which ICE relies or explaining why an evaluation of a given database was unnecessary. Because the court failed to do so, the court erred in concluding that ICE's practice of relying solely on searches of "the databases" to make probable cause determinations violates the Fourth Amendment.

### 2. The Database Purpose Error

In evaluating the reliability of the databases on which ICE relies, the district court relied on Footnote 7 of our decision in *Millender v. County of Los Angeles*, 620 F.3d 1016, 1029 n.7 (9th Cir. 2010) (en banc), *rev'd and vacated on other grounds by Messerschmidt v. Millender*, 565 U.S. 535 (2012), to reason that whether a database was intended to provide probable cause of removability determines whether that database is reliable for that purpose. *See Gonzalez*, 416 F. Supp. 3d at 1017–18. Applying that lens, the court concluded that "the databases ICE uses are unreliable because no single database used was intended to provide any indication of probable cause of removability." *Id.* at 1019.

The district court's conclusion, however, stemmed from a fundamental misreading of *Millender*. In *Millender*, we rejected the dissent's reliance on a statement in an affidavit used to support a search warrant, which referred to information contained in the "cal-gang database." *Compare Millender*, 620 F.3d at 1029 n.7 (opinion of the court), *with id.* at 1036 n.1 (Callahan, J., dissenting). We explained that the magistrate judge could not infer a prior felony conviction from that reference because the advisory note for the database expressly "warn[ed] that the [] database 'is not designed to provide users with information upon which official actions may be taken,' and 'cannot be used to provide probable cause for an arrest or be documented in an affidavit for a search warrant.'" *Id.* at 1029 n.7 (citation

omitted). We did not suggest that an express admonition not to use a database to make a probable cause determination meant that database purpose more generally determines the reliability of a database; indeed, we did not address the reliability of the database at all.

Properly understood, our reasoning in *Millender* would support the *exclusion* of a database from the probable cause calculus for evaluating the merits of the Database Claim if a database on which ICE relies warns against reliance on it to make probable cause determinations of removability specifically or, more generally, for civil immigration purposes. But the district court made no such findings. Because we cannot extricate the court's erroneous reading of *Millender* from its conclusion that the databases on which ICE relies are unreliable, we conclude that the district court committed legal error.

### 3. The Failure to Find or Analyze Systematic Error

Finally, we come to the most fundamental error in the district court's analysis: the absence of any findings on or an assessment of *systemic error* in ICE's probable cause determinations based on searches of electronic databases. The Database Claim that Plaintiffs raise is a challenge to a system of databases on which ICE relies to issue detainers from the Central District for class members. Thus, to find for Plaintiffs on this claim, it was not enough for the district court to identify errors in individual databases on which ICE relies. Instead, the district court had to make findings about and explain how this system of databases results in "unreliable" probable cause determinations. *Herring*, 555 U.S. at 146; *see also Evans*, 514 U.S. at 17 ("Surely it would not be reasonable for the policy to rely, say, on a recordkeeping system . . . that has no mechanism to ensure

its accuracy over time and that routinely leads to false arrests.").

Unreliable here means that ICE routinely issues immigration detainers  without reasonably trustworthy evidence of removability.  As the experiences of Gonzalez and other individuals who are not removable but have been subject to an immigration detainer underscores, unreliability has tangible consequences.  One way to assess the trustworthiness of ICE's system is to quantify these unlawful arrests and use them to determine the nature and extent of any systematic error.  We are unable, however, to identify any findings by the district court of systematic error in the issuance of detainers from the Central District, let alone a reasoned analysis on this issue.

To be sure, the district court briefly touched on "the effect of ICE's reliance on the databases for probable cause determinations."  *Gonzalez*, 416 F. Supp. 3d at 1011. Focusing on data from when PERC relied on fewer databases, the court observed that PERC issued some 12,797 detainers between May 2015 and February 2016.  *Id.*  Of these detainers, ICE lifted 771 detainers because the individuals were either U.S. citizens or otherwise not subject to removal and, of those, 42 were U.S. citizens.  *Id.*  But the court did not translate this data into findings about detainer lift rates that might illuminate whether the Government's system of databases routinely results in the Government issuing detainers for class members who are not removable.[25]  Nor did the district court identify any evidence

---

[25] Although the parties dispute the lift rates of this data and whether the true error rate is higher, it is not our role to make factual findings.

of lift or error rates based on the system of databases on which ICE actually relied as of December 2017.

Relatedly, the court failed to account for or examine systematic error in its analysis of whether the Government's database practices violate the Fourth Amendment. *Id.* at 1017–20. Even if an individual database provides incomplete information, other databases may compensate for those weaknesses, resulting in a sufficiently reliable accumulation of evidence to furnish probable cause. Although the court's finding of a Fourth Amendment violation turned on error in individual databases in light of case law concerning individual databases, the fact of such error in individual databases here could not lead to the conclusion that ICE's system of databases routinely fails to provide reasonably trustworthy evidence of removability.

It may be that despite our disagreements with the district court's analysis here, the court will ultimately be proven correct about the unreliability of ICE's system of databases. But we cannot take the laboring oar on resolving factual issues and performing legal analysis that the district court never did when it found in favor of Plaintiffs on the Database Claim and permanently enjoined the Government from relying solely on searches of electronic databases to issue immigration detainers from the Central District. *See Gonzales v. Thomas*, 547 U.S. 183, 185 (2006) (per curiam). When a district court has applied the wrong legal standard, "we ordinarily remand the case so that it may apply the correct one in the first instance." *Kirkpatrick v. Chappell*, 872 F.3d 1047, 1058 (9th Cir. 2017).

In light of the foregoing errors, the district court abused its discretion when it entered the Database Injunction. We reverse and vacate the judgment and injunction on the Database Claim, and remand for the district court to

reconsider the claim, including by making additional findings of fact as are necessary to properly resolve it.

## VI.     The *Gerstein* Claim

Finally, we come to Plaintiffs' cross appeal concerning the district court's grant of summary judgment for the Government on the *Gerstein* claim of the Judicial Determination Class.  The class is defined, in relevant part, to include those individuals detained pursuant to a detainer for longer than 48 hours.  The legal contention undergirding the *Gerstein* claim is that the Fourth Amendment requires prompt review of a probable cause determination of removability "by an independent, neutral official who is not engaged in law enforcement activities" to justify detention pursuant to an immigration detainer.  The district court thought that *Gerstein* was inapposite because *Gerstein* arose in the criminal context rather than the civil immigration context.  The district court erred in concluding so, and thus we reverse on this issue.

In *Gerstein v. Pugh*, the Supreme Court considered the legality of state law criminal procedures, which permitted a person arrested without a warrant and charged by a prosecutor's information to be jailed pending trial without any opportunity for a probable cause determination. 420 U.S. at 116.   In holding this procedure to be unconstitutional, the Court explained that it "has required that the existence of probable cause be decided by a neutral and detached magistrate whenever possible" "[t]o implement the Fourth Amendment's protection against unfounded invasions of liberty and privacy[.]"  *Id.* at 112. The Court explained that a "neutral and detached magistrate" is one who is "independent of police and prosecution."  *Id.* at 112–13, 118.  The Court recognized that "a policeman's on-the-scene assessment of probable cause provides legal

justification for arresting a person suspected of crime, and for a brief period of detention to take the administrative steps incident to arrest." *Id*. at 113–14. But "[o]nce the suspect is in custody, however, the reasons that justify dispensing with the magistrate's neutral judgment evaporate." *Id*. at 114. "When the stakes are [as] high" as "prolonged detention," "the detached judgment of a neutral magistrate is essential if the Fourth Amendment is to furnish any meaningful protection from unfounded interference with liberty." *Id.* Thus, "the Fourth Amendment requires a judicial determination of probable cause as a prerequisite to extended restraint of liberty following arrest." *Id.* That determination must be "timely." *Id*. at 126.

The Court elaborated on the timeliness aspect of *Gerstein* in *County of Riverside v. McLaughlin*. The Court explained that "[a] . . . judicial determination[] of probable cause within 48 hours of arrest will, as a general matter, comply with the promptness requirement of *Gerstein*." 500 U.S. at 56. "Where an arrested individual does not receive a probable cause determination within 48 hours, the calculus changes. In such a case, the arrested individual does not bear the burden of proving an unreasonable delay." *Id*. at 57. Instead, the government bears the burden "to demonstrate the existence of a bona fide emergency or other extraordinary circumstance." *Id*.

The critical question here is whether the Fourth Amendment principle that *Gerstein* articulated applies to the civil immigration context. The answer to this question is necessarily "yes." The Supreme Court confirmed long ago that any detention of a suspected alien "must be based on consent or probable cause" that the person is in fact an alien. *Brignoni-Ponce*, 422 U.S. at 881–82. In short, the "broad congressional power over immigration . . . cannot diminish

the Fourth Amendment rights of citizens who may be mistaken for aliens." *Id.* at 884. It necessarily follows that the Fourth Amendment requires a prompt probable cause determination by a neutral and detached magistrate to justify detention beyond that which may be initially justified by any probable cause determination of removability.

We are not persuaded by the Government's objections to the application of *Gerstein* in this context.[26] The Government argues that immigration detainers are exempt from *Gerstein* based on the Supreme Court's observation in a different context that "[a] deportation hearing is a purely civil action to determine the eligibility to remain in the country" and thus "various protections that apply in the context of a criminal trial do not apply in a deportation hearing." *Immigration & Naturalization Serv. v. Lopez-Mendoza*, 468 U.S. 1032, 1038 (1984). *Lopez-Mendoza*, however, has no bearing on whether *Gerstein* applies to arrests or detention for civil immigration purposes. That case concerned the application of the judge-made exclusionary rule—a "prudential doctrine" that concerns "an issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated." *Davis v. United States*, 564 U.S. 229, 236, 244 (2011) (internal quotation marks and citations omitted).

The Government's reliance on *Abel v. United States*, 362 U.S. 217 (1960), as a basis for not applying *Gerstein* here is also unavailing. In *Abel*, the Supreme Court opined that, consistent with the Fourth Amendment, immigration

---

[26] We summarily reject the Government's reliance on *United States v. Tejada*, 255 F.3d 1 (1st Cir. 2001), a decision which concerned the application of Federal Rule of Criminal Procedure 5(a). *Id*. at 2. That decision is irrelevant to the constitutional issue here.

authorities may arrest individuals for civil immigration removal purposes pursuant to an administrative arrest warrant issued by an executive official, rather than by a judge. *Id.* at 230–34. Although an immigration detainer is not an administrative warrant, we will assume that *Abel* nevertheless applies here. Even with that assumption, *Abel* is of no help.

Nothing in *Gerstein*, or the principle that it articulated, requires review of a probable cause determination by an Article III judge. *See, e.g.*, *Shadwick v. City of Tampa*, 407 U.S. 345, 350 (1972) (allowing "neutral and detached" municipal court clerks to issue arrest warrants). Plaintiffs concede here that they do not claim that the Fourth Amendment requires that an Article III judge make a probable cause determination. Instead, they ask only for review by a sufficiently detached and neutral executive official, such as an immigration judge. We have previously acknowledged the permissibility of such review. *Flores v. Meese*, 942 F.2d 1352, 1358, 1364 (9th Cir. 1991) (requiring immigration judges to "determine probable cause for [an immigration] arrest"), *rev'd on other grounds by Reno v. Flores*, 507 U.S. 292 (1993). And such review is otherwise consistent with *Abel*'s recognition that Congress may delegate certain decisions to executive officials in the immigration context without violating the Fourth Amendment.

Finally, the Government relies on our decision in *Rhoden v. United States*, 55 F.3d 428 (9th Cir. 1995), a case concerning a border detention. We do not understand how *Rhoden* affects whether *Gerstein* applies to the immigration detainers at issue here. Properly understood, *Rhoden* concerns whether the unique circumstances of a particular type of detention affects the timing of a probable cause

determination by a detached and neutral magistrate, not whether such a determination is required at all. We acknowledged there that "[i]n the context of a criminal arrest, a detention of longer than 48 hours without a probable cause determination violates the Fourth Amendment as a matter of law in the absence of a demonstrated emergency or other extraordinary circumstance." *Id*. at 432 n.7 (citing *McLaughlin*, 500 U.S. at 44). But we explained that "border detentions involve a distinct set of considerations and require different administrative procedures." *Id*. With these unique circumstances in mind, we remanded *Rhoden* for additional factfinding regarding the reasonableness of the detention without a probable cause hearing. *Id.* at 432. Unlike *Rhoden*, this case does not concern border detention. We do not otherwise see what unique set of considerations could apply to the issuance of immigration detainers to individuals who are already in the custody of a state or local LEA.

In short, we conclude that the district court erred when it granted summary judgment for the Government on the Judicial Determination Class's *Gerstein* claim based on the conclusion that *Gerstein* does not apply to the civil immigration context. Detaining persons for more than 48 hours pursuant to an immigration detainer implicates *Gerstein*. We therefore reverse and remand for the district court to apply the correct legal standard in the first instance.[27] *See Kirkpatrick*, 872 F.3d at 1058; *Zetwick v. County of Yolo*, 850 F.3d 436, 442 (9th Cir. 2017).

---

[27] Remand is especially appropriate here because, in the time since the district court considered Plaintiffs' *Gerstein* claim, the Government has changed its immigration detainer policy to require the issuance of an administrative warrant alongside any immigration detainer. Although Plaintiffs argue that this policy still violates *Gerstein*, the district court

# CONCLUSION

For the foregoing reasons, we conclude that Gonzalez had standing at the time that he brought suit to seek prospective injunctive relief and ICE's cancellation of the detainer it placed on Gonzalez did not moot his claim. We hold that § 1252(f)(1)'s limitations on injunctive relief do not apply to the claims at issue in this case. We **AFFIRM** the district court's certification of the Probable Cause Subclass. We **REVERSE** and **VACATE** the State Authority Injunction. We **REVERSE** and **VACATE** the Database Injunction, and **REMAND** for the district court to reconsider the Database Claim. Finally, we **REVERSE** and **VACATE** the summary judgment for the Government on the *Gerstein* claim, and **REMAND** for the district court to reconsider the claim.

**AFFIRMED IN PART**; **REVERSED AND VACATED IN PART; and REMANDED for proceedings consistent with this opinion. EACH SIDE SHALL BEAR ITS OWN COSTS.**

---

BADE, Circuit Judge, dissenting:

The plaintiffs in this case seek classwide orders enjoining Immigrations and Customs Enforcement (ICE) from using certain databases when deciding whether to issue immigration detainers and from collaborating with law enforcement in certain states to detain suspected removable

---

never considered that issue. Because we are a court of review and not first view, *Gonzales*, 547 U.S. at 185, we decline to consider the issue here.

aliens.  It is difficult to see how such orders would not work to "enjoin or restrain the operation of the provisions of part IV" of the Immigration and Nationality Act (INA).[1]  *See* 8 U.S.C. § 1252(f)(1).  Because Congress has enacted a clear jurisdictional bar to such relief in § 1252(f)(1), I respectfully dissent.

## I

The majority reasons that because 8 U.S.C. § 1357(d) is the only provision in the INA that explicitly mentions immigration detainers, and it "is *not* located in 'Part IV,'" § 1252(f)(1) does not bar injunctive relief in this case.  Maj. Op. 42 n.16.  I find this approach flawed for two reasons.

First, the majority purportedly relies on the plain language of the statute to conclude that § 1252(f)(1) does not bar injunctive relief in this case.  Maj. Op. 40.  But its interpretation *ignores* the plain language of the statute, which prohibits classwide injunctive relief that would "enjoin or restrain *the operation of* the provisions of part IV."  § 1252(f)(1) (emphasis added).  Under the majority's interpretation, § 1252(f)(1) would not bar an order that enjoins or restrains any important law enforcement tool that ICE employs to enforce the provisions of part IV (such as the tools identified in § 1357, "Powers of immigration officers and employees"),[2] unless that tool is specifically

---

[1] The reference in § 1252(f)(1) to "part IV" is to 8 U.S.C. § 1221–1232, a series of provisions addressing the "Inspection, Apprehension, Examination, Exclusion, and Removal" of aliens.  *See* 8 U.S.C. ch. 12, subch. II, pt. IV.

[2] These powers include:  warrantless interrogations, arrests, and searches of vessels, railway cars, aircraft, or vehicles, § 1357(a); carrying a firearm and executing or serving any order, warrant,

identified in part IV.  Thus, the majority reads the words "the operation of" out of the statute.

Second, the majority's analysis of § 1252(f)(1) relies on the apparent conclusion that § 1357(d) is the entire source of ICE's detainer authority.  Maj. Op. 42–43.  But the statute's plain language renders that conclusion implausible. Section 1357(d) does not authorize or define detainers. Instead, it provides that, under certain circumstances, an immigration officer must promptly determine "whether or not to issue a detainer" for an alien arrested for a controlled substances offense.  § 1357(d)(3).  In fact, nothing about the structure or text of the INA suggests that § 1357(d) is the sole source of ICE's authority to issue detainers to facilitate the arrest and detention of suspected removable aliens.

A

The majority concludes that § 1252(f)(1) does not apply to provisions that fall outside of part IV of the INA.  Maj. Op. 40–41.  But § 1252(f)(1) does not insulate *provisions* from injunctive relief; it insulates the *operation* of those provisions.  Thus, § 1252(f)(1) bars classwide injunctive relief that restrains "*the operation of*" provisions within part IV of the INA, even if ICE's authority to enforce the provisions of part IV comes, in part, from provisions that are

---

subpoena, summons, or other process, § 1357(a)(5)(B); administering oaths and taking evidence, § 1357(b); warrantless searches of the person and of personal effects in the possession of any person seeking admission to the United States, § 1357(c); fingerprinting and photographing certain aliens, § 1357(f); and entering agreements with state and local governments for their officers or employees to function as immigration officers for the investigation, apprehension, or detention of aliens, § 1357(g).

not within part IV.  *See* § 1252(f)(1) (emphasis added).  The statute reads:

> (f)  Limit on injunctive relief
>
> (1)  In general
>
> Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter . . . other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated.

§ 1252(f)(1).  By barring the lower courts from issuing classwide relief that "enjoin[s] or restrain[s] the operation of the provisions of part IV," *id.*, Congress requires the lower courts to determine whether the requested relief has the effect of enjoining or restraining the operation of the provisions at issue; if so, then the lower courts lack jurisdiction to grant that relief.[3]  *See Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 481–82 (1999) ("By its plain terms, and even by its title, [§ 1252(f)(1)] is nothing more or less than a limit on injunctive relief.  It prohibits

---

[3] Thus, in *Gonzales v. Department of Homeland Security*, when analyzing whether an injunction restricting DHS from unlawfully denying adjustment of status applications ran afoul of § 1252(f)(1), this court held that § 1252(f)(1) did not apply because the injunction only enjoined or restrained the operation of "[a] provision which falls under part V."  508 F.3d 1227, 1233 (9th Cir. 2007).

federal courts from granting classwide injunctive relief against the operation of §§ 1221–1231, but specifies that this ban does not extend to individual cases.").

The majority, however, does not undertake this analysis. Instead, in its view, § 1252(f)(1) is inapplicable unless the object of the requested relief—in this case a detainer—is mentioned in a provision that appears in part IV. Thus, the majority erroneously focuses exclusively on what it considers the source of the detainer power without regard for the effects of restricting that power. *See, e.g.*, *Vazquez Perez v. Decker*, 18-cv-10683, 2019 WL 4784950, at *5 (S.D.N.Y. Sept. 30, 2019) ("The relevant inquiry, then, is whether the . . . injunctive relief [the plaintiff] seeks on a classwide basis would enjoin or restrain the method or manner of functioning of Sections 1221–1232."). Even if some provision outside part IV *authorizes* immigration detainers, we must go further and ask whether the classwide injunctions sought here, by restricting ICE's ability to apprehend and detain suspected removable aliens, impose "limitations on what the government can . . . do under the removal and detention provisions." *Hamama v. Adducci*, 912 F.3d 869, 880 (6th Cir. 2018).

Although the § 1252(f)(1) inquiry may involve locating the statute authorizing the conduct at issue, that is not the whole inquiry. The ultimate question is not simply whether the authority for that conduct comes from part IV, but whether a court order restricting that conduct "enjoin[s] or restrain[s] *the operation of*" part IV. § 1252(f)(1) (emphasis added). If the majority reached this question, it could not avoid concluding that the classwide relief Plaintiffs request directly implicates ICE's statutory charge under part IV to apprehend and detain suspected removable aliens because it restricts ICE's power to issue detainers, which serve "the

purpose of arresting and removing [] alien[s]." *Mendia v. Garcia*, 768 F.3d 1009, 1011 (9th Cir. 2014) (quoting 8 C.F.R. § 287.7(a)).

## B

Moreover, the majority ties its analysis of § 1252(f)(1) to what it apparently considers the source of ICE's authority to issue detainers, § 1357(d). Because this is the only INA provision that explicitly mentions detainers, and because § 1357(d) falls outside part IV, the majority concludes that the analysis is complete and § 1252(f)(1) does not apply. Maj. Op. 44. I disagree. Even if we assume that the § 1252(f)(1) inquiry turns on the source of the detainer power, it is implausible that ICE's power to issue immigration detainers stems entirely from § 1357(d).

That provision, entitled "Detainer of aliens for violation of controlled substances laws," reads:

> In the case of an alien who is arrested by a Federal, State, or local law enforcement official for a violation of any law relating to controlled substances, if the official (or another official)—
>
> (1) has reason to believe that the alien may not have been lawfully admitted to the United States or otherwise is not lawfully present in the United States,
>
> (2) expeditiously informs an appropriate officer or employee of the Service authorized and designated by the Attorney General of the arrest and of facts concerning the status of the alien, and

(3) requests the Service to determine promptly whether or not to issue a detainer to detain the alien,

the officer or employee of the Service shall promptly determine whether or not to issue such a detainer. If such a detainer is issued and the alien is not otherwise detained by Federal, State, or local officials, the Attorney General shall effectively and expeditiously take custody of the alien.

§ 1357(d).

Although it uses the term "detainer" in its title and three more times in its text, § 1357(d) never defines the term. The statute seems to assume that there are standards to guide an officer in "determin[ing] whether or not to issue such a detainer," but it does not provide or point to any standards itself. *Id.* In fact, § 1357(d) never explicitly *authorizes* the issuance of detainers at all—even though the same statute enumerates, in three other places, actions that "[a]ny officer of employee of the Service . . . *shall have the power*" to take. § 1357(a)–(c) (emphasis added); *see Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (alteration in original) (citation omitted)). Nothing in the text of § 1357(d) suggests that it is the source of congressional authorization for ICE to issue detainers; rather, it simply mandates ICE's prompt response to detainer requests under certain, very specific circumstances involving controlled substances offenses.

To conclude otherwise by disregarding the plain language of § 1357(d) and interpreting it as the sole source of ICE's detainer authority—rather than as a requirement for ICE to respond promptly to detainer requests in cases involving controlled substances offenses—carries troubling implications. If § 1357(d) is the sole source of authorization for immigration detainers, future plaintiffs could argue that ICE acts *ultra vires* whenever it issues a detainer for a suspect who was not arrested for a controlled substance offense. *See, e.g.*, *Comm. for Immigrant Rts. of Sonoma Cnty. v. County of Sonoma*, 644 F. Supp. 2d 1177, 1198 (N.D. Cal. 2009) (rejecting plaintiffs' argument "that [8 C.F.R.] § 287.7 is facially invalid because its authorizing statute, § 1357, limits ICE's authority to issue detainers for aliens in custody for violating laws relating to controlled substances").[4] Such an argument would have far-reaching consequences, and although unsupported by the plain language of INA provisions at issue, it would seem to garner support from the majority's conclusion that § 1357(d) is the sole source of ICE's detainer authority.

In contrast to what the text of § 1357(d) actually provides, the majority's citation to *McLean v. Crabtree*, 173 F.3d 1176, 1185 n.12 (9th Cir. 1999), bears little weight. There, the court noted in dicta that "[t]he INS has authority to lodge a detainer against a prisoner under 8 U.S.C. § 1357(d)." *Id.* Thus, the court in *McLean* suggested that § 1357(d) is *a* source of detainer authority, but it certainly did not hold that it is the *only* source.

---

[4] Perhaps recognizing these implications, the majority cites *Commission for Immigrant Rights*, 644 F. Supp. 2d at 1199, but concludes that it need not decide whether the regulation authorizing detainers, 8 C.F.R. § 287.7, is valid. Maj. Op. 42 n.16.

The majority also notes that 8 U.S.C. § 1103 authorizes DHS "to promulgat[e] regulations to carry out the provisions of the INA," but asserts that "[w]hat matters here is that that general grant of authority is *not* located in 'Part IV.'" Maj. Op. 42 n.16.  Thus, the majority seems to suggest that, even if we consider § 1103 an additional or alternative source of ICE's detainer power, § 1252(f)(1) does not bar the classwide relief Plaintiffs request because § 1103 is not in part IV of the INA.[5]  But grounding ICE's detainer power in § 1103—a "general grant of power to administer and enforce all immigration laws," *Castaneda-Gonzalez v. INS*, 564 F.2d 417, 423 (D.C. Cir. 1977)—does not answer whether § 1252(f)(1) bars the relief Plaintiffs request.  Section 1103 is ultimately the statutory source of *all* of ICE's authority, including ICE's detainer authority, but that does not mean that ICE does not also derive its detainer authority from other provisions of the INA, including part IV, which authorizes the "Inspection, Apprehension, Examination, Exclusion, and Removal" of aliens.

Although we need not determine the sources of ICE's detainer authority to determine whether enjoining that authority "enjoin[s] or restrain[s] the operation of the provisions of part IV," § 1252(f)(1), we can nonetheless avoid all these problems of the majority's approach by acknowledging that the power to issue detainers—that is, to request that another law enforcement officer detain a suspect—arises impliedly from the INA statutes authorizing

---

[5] This argument also fails for the same reason the majority's arguments based on § 1357(d) fail:  even if the source of ICE's detainer authority is outside part IV, a restriction on ICE's ability to use detainers "enjoin[s] or restrain[s] the operation of the provisions of part IV," § 1252(f)(1), because it restrains ICE's ability to arrest and detain suspected removable aliens.

officers to arrest and detain suspects themselves.  *See, e.g.*, *Santoyo v. United States*, No. 5:16-CV-855-OLG, 2017 WL 6033861, at \*3 & n.3 (W.D. Tex. Oct. 18, 2017) (collecting cases and concluding that "[a]lthough no other provision of the INA specifically authorizes the issuance of detainer requests, that authority predates the INA and has long been viewed as implied by federal immigration enforcers' authority to arrest those suspected of being removable."). Indeed, this is the Department of Homeland Security's interpretation of the statutes it administers.[6]    The Department has stated that it issues detainers "pursuant to sections 236 [8 U.S.C. § 1226] and 287 [8 U.S.C. § 1357] of the Act."  8 C.F.R. § 287.7(a).

Section 1357 is not in part IV, but § 1226 is, and its broad authorization to arrest and detain aliens accords with the conclusion that the detainer power stems from ICE's arrest and detention powers under part IV.  *Compare* 8 U.S.C. § 1226(a) ("On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States."), *with* 8 C.F.R. § 287.7(a) (stating that detainers serve "the purpose of arresting and removing the alien").[7]  Thus, even under the majority's flawed approach

---

[6] The government has not argued for *Chevron* deference, and the majority appropriately declines to reach this issue.  *See, e.g.*, *Neustar, Inc. v. FCC*, 857 F.3d 886, 893–94 (D.C. Cir. 2017).  Nonetheless, the Department's interpretation of its detainer authority in the INA presents, by far, the most reasonable approach.

[7] The majority suggests that § 1226 is inapplicable because it only explicitly authorizes *DHS* to arrest aliens, and "critically, neither DHS, nor ICE arrests or detains any individual by issuing an immigration detainer."  Maj. Op. 45.  But this misses the point that what the statute authorizes DHS to do directly, it impliedly authorizes DHS to do through

of applying § 1252(f)(1)'s bar only to law enforcement tools that part IV itself authorizes, it should have concluded that classwide relief was barred here because part IV *does* authorize detainers, albeit impliedly, when it authorizes ICE to arrest and detain suspected removable aliens.

## II

The majority's approach overlooks § 1252(f)(1)'s insulation of "the operation of" the immigration enforcement provisions in part IV of the INA from judicial classwide injunctions. §1252(f)(1). And because the majority misapplies its own purportedly textualist approach, it erroneously concludes that the sole source of ICE's entire detainer power is a statute that merely requires officers to promptly decide whether to issue detainers for aliens arrested for controlled substances offenses. Because the majority's approach misreads § 1252(f)(1) and opens the door to sweeping challenges to basic tools of immigration enforcement, I respectfully dissent.

---

cooperative state and local law enforcement. Rather than engage with this point, the majority employs circular reasoning: § 1226 cannot *impliedly* authorize detainers because § 1226 contains no *explicit* authorization for detainers.